### JIM BLACK v. THE STATE.

#### No. 2913. Decided March 16, 1904.

#### 1.—Jury and Jury Law—Challenge for Cause—When Made.

Where a juror was examined upon his voir dire whether he had conscientious scruples in inflicting the death penalty, and he answered that he d'd not and was accepted, and afterwards, before the jury was completed, made it known to the court that he had not understood the question at the time, and that he did have such scruples, there was no error in permitting the State to challenge him for cause.

#### 2.—Evidence—Res Gestae.

Testimony to the effect that upon noticing the defendant engaged in disorderly conduct that the witness, as mayor of the town, ordered the marshal to arrest him and the marshal's reply thereto that he was ill and that he deputized deceased and another to make the arrest, was admissible in trial of defendant for the murder of deceased.

**3.—Practice—Witnesses Allowed to Show Position of Parties.**

There was no error in permitting State's counsel to place parties testifying in position before the jury to illustrate the relations of the parties to each other during the difficulty which ended in the homicide for which defendant was being tried.

**4.—Evidence—No Injury Shown—Bill of Exception.**

Witness could state that a great number of people were in the habit of going to the depot in the town where the homicide occurred, some to buy tickets and some to "knock around," the bill of exception failing to point out any injury to appellant.

**5.—Confessions—Warning—Officer.**

Where defendant was placed in charge of the mayor of the town, after arrest, and warned by him that any statement he might make could be used as evidence against him, the predicate for his subsequent confessions at different times to different persons was properly laid, the same being made with said warning in mind, and it was immaterial whether the warning was made by an officer.

**6.—Evidence—Sufficiency to Support Conviction.**

Where the evidence shows express malice of the defendant towards the deceased, such as threats, former grudges and preparation to kill, the judgment inflicting the death penalty will not be disturbed.

ON REHEARING.

**7.—Bill of Exception—Objections to Impaneling Jury.**

Where the objection to the manner of impaneling the jury was not made at the time, but not until motion for new trial, it comes too late, although a bill of exception was taken to the action of the court in overruling said motion.

Appeal from the District Court of Grayson. Tried below before Hon. Rice Maxey.

Appeal from a conviction of murder in the first degree; penalty, death.

Al. Allsup, the party who was with deceased when he was shot, and who made the arrest, testified that about dusk on the day of the killing the town marshal told the deceased and witness to go and arrest the defendant. Deceased (Jordan), McCoy, the marshal and witness went to where defendant was, near the grain house. The defendant had a gun in his hand and his hat off, swearing and singing. "I told him we had come to arrest him and we did not want any trouble. He replied, "Don't come any closer, or I will shoot you." I suppose I was five or six feet from him at that time. I told defendant, Jim Black, I did not want any trouble with him; that he was only charged with a small offense, and to put up his gun. He said, "I will not do it; I will kill you if you come any closer; don't crowd me." He commenced backing and backed off, and I went walking on toward him; finally he turned and commenced trotting off. McCoy, Jordan and I followed him. He walked south about thirty feet and then turned east. After he had gone east for some distance, he turned northeast. As he was going east he said, "Don't you follow me, or I will kill you." He said this a number of times. As he went east, part of the time he went backward and part of the time forward. The deceased followed ten to fifteen feet behind him. The defendant had his gun in his hand with his hand

on the hammer. He stopped at the north corner of the livery stable after he had crossed a ditch, turned, cocked the gun, and said, "Don't come any further, or I will kill you." I was about ten feet away from him at that time and the deceased was a little further. I told him not to shoot and he turned around and ran a short distance and jumped another ditch. We crowded him and he turned around and started to throw up his gun, and I said, "Don't raise that gun." He then ran, I suppose forty yards; he started to draw his gun and said, "Don't follow me any further." Jordan and I checked up and then he turned and continued to run. We followed him; he jumped a third ditch and I crossed close behind him; deceased crossed the ditch a little southeast. We made a dash upon him, and then he fired. He whirled and fired right at Jordan; I was something like five feet from him when he fired. When he fired, I made a leap and caught him; as I caught him, the barrel of the gun struck me on the right arm. When the gun was fired, the gun was in the defendant's hands with the stock resting against his arm. The gun was not at his shoulder, but was lower. The deceased was about ten feet from the defendant when the shot was fired. * * * Jordan and I went to Baxter's hardware store and got our six-shooters; the pistols were loaded in the store. * * * I did not have my pistol out and did not pull it at that time. * * * After he started away he turned around once and cocked his gun; I pulled my pistol. * * * I don't think the defendant was drunk. I did not hit the defendant with my .pistol; I saw a stranger hit him with a six-shooter after he was arrested.

Cliff Davis testified, for the State, that he saw defendant on the day of the killing near a restaurant in Howe. He had a double-barrel shotgun, and heard him say he was going to kill McCoy and Albert Jordan if they undertook to arrest him. He broke his gun at the breach, so as to expose the shells. The gun was loaded, and defendant said one of the shells was for McCoy and the other for Albert Jordan.

Roy Phares testified, for the State, that he met defendant on the day of the homicide. Defendant said that he and John Watkins had been in Howe that day and that Watkins had gone to Sherman for some whiskey and would return to Howe on the 6 o'clock train. * * * Defendant said that he had been to Watkins' to feed the stock and that he was on his way back to Howe to meet Watkins when he returned with the whisky. The defendant said he had been arrested his last time at Howe, and that he would kill McCoy and Alsup if they undertook to arrest him. He said he would kill anybody that looked cross-eyed at him. "I asked him to loan me some loaded shells and he handed me two No. 4 shells, and after he had handed them to me, he said, "Those are No. 4; give them back to me; I may need them." In that conversation on the railroad, Black said that he was not going to be arrested, and that Watkins had a pistol and would stick to him.

D. Aruspiger testified, for the State, that he saw John Watkins at

Sherman on the day of the homicide, in the afternoon; he had a pistol in his pocket and witness took it from him and carried it to Howe. Watkins was drunk, and went to Howe on the 6 o'clock train that afternoon and had a jug of whisky with him.

Ed. Tucker testified, for the State, that he met defendant at the depot on the day of the homicide; he asked witness whether deceased (Albert Jordan) had said anything about arresting him; witness said no; defendant then said, "If he undertakes to arrest me, I am going to fix him." He had a shotgun at the time.

This statement, together with that contained in the opinion, shows the State's case.

The defendant, besides introducing a number of witnesses, testified in his own behalf. The testimony for the defense was substantially that the defendant and deceased met about 12 o'clock on the day of the killing and made friends and took a drink together, and that deceased said he would not attempt to arrest him any more; that he was defendant's friend and would not have attempted to arrest him before had it not been for old man McCoy, whom he was trying to please. That when deceased, Alsup and McCoy approached defendant to arrest him, John Watkins was with him, but was drunk, lying on the ground, and defendant was drinking, and that he told them that he would take care of Watkins and to let him (defendant) alone; that he would get out of town and that Baxter, the mayor, said, "Don't shoot him, boys."

The defendant also stated on the stand that his gun was accidentally discharged as he stumbled or fell in trying to get away from his pursuers, and that he had no recollection of making any threats against deceased and others.

*C. Huggins, Chas. Crenshaw, A. S. Phelps,* and *W. N. Walton* filed motion and argument for rehearing.—Bates v. State, 67 S. W. Rep., 504; Ripley v. State, 29 Texas Crim. App., 37; Stribling v. State, 15 Id., 249; Hill v. State, 10 Id., 618; White's C. C. P., art. 737, and authorities there cited.

*Howard Martin,* Assistant Attorney-General, for the State.—Horbach v. State, 43 Texas, 242; Baker v. State, 3 Texas Crim. App., 525; Drake v. State, 5 Id., 649.

DAVIDSON, PRESIDING JUDGE.—Conviction of murder in the first degree, the punishment assessed being the death penalty.

While impaneling the jury, the juror Atkins was asked the question if he had conscientious scruples against the infliction of death as a punishment for crime. He answered this in the negative, and was accepted by both parties. He was the first juror taken. The organization of the jury continued until three other jurors were selected, and

the court took a recess. During this recess Atkins, through an officer in charge of the four jurors, sent a message to the court that he desired to make an explanation in reference to a mistake in answering the question as to his conscientious scruples in regard to inflicting the death penalty. This explanation was made privately to the court. His explanation was that he misunderstood the question, and thought it was meant to inquire of him if he had conscientious scruples about the way the man was killed. But after his selection and after hearing the examination of the other jurors, and the explanation of the court to them as to what was meant by this question in regard to the conscientious scruples, he discovered his mistake in answering the question when he was being examined, and stated to the court that he did have such conscientious scruples. The court thereupon informed counsel for prosecution and the defense of this explanation, whereupon State's counsel asked to be allowed to further examine the juror. Objection was urged by appellant on the ground that he had already been accepted by both sides, sworn and placed in the jury box. This was overruled. Whereupon the court said, "Mr. Atkins, you informed me a few minutes ago that when you were being interrogated by counsel, you did not understand the question? A. Yes, sir. Q. I will ask you now whether or not you have conscientious scruples in regard to the infliction of the punishment of death for crime? A. Yes, sir. Q. You answered when you were being interrogated at first, that you did not have. A. Well, the way I understood that was, when he asked the question, did I have any conscientious scruples about the way this man was killed. That was the way I understood the question. Q. You did not understand the question to be whether or not you were opposed to inflicting death as a punishment for crime? A. No, sir; that is not the way I understood it." The juror then stated, in response to further question, that he was opposed to the infliction of the death penalty for crime under any circumstances. The prosecution then challenged the juror. Counsel for defendant excepted to the court permitting the juror to be recalled for this cross-examination on the ground before stated. The court then sustained the challenge, and the juror was excused. The court informed counsel that upon further reflection he was inclined to the opinion that the juror would have to remain on the jury, or else the whole panel would have to be discharged, and that he would discharge all of the jurors thus far selected, reset the case and draw another venire. Counsel interposed an objection to this procedure. The court then stated to counsel he could confer with his client. There were then eight jurors in the box, who were retired from the courtroom. Whereupon the following statement was made by the court: "Now, upon investigation, the court is inclined to the opinion that the juror Atkins would have to remain on the jury, or else the whole panel would have to be discharged;" and asked appellant what objections he had to discharging the eight jurors already selected, reset-

ting the case, and drawing another venire. Appellant in person urged his objection. The objection was urged that the court had no right to discharge the panel without the consent of defendant, that he could not be placed again on trial for the same offense. The State demanded that the case proceed with the organization of the jury. The court remarked: "The State desiring it, and the defendant objecting to discharging the panel and resetting the case, I will proceed with the organization of the jury." And this was done without Atkins' presence on the jury. It is well settled that after the selection of a juror in a capital case a peremptory challenge can not be interposed; and this whether the jury has been completed or not. However, that question is not in the case. The question here presented is, whether or not a cause for challenge can be interposed after the juror has been selected. It will be noted that in capital cases the procedure is different from that obtaining in noncapital cases, in this: in a capital case each juror is impaneled as he is selected, and in noncapital cases the jury is impaneled as a whole. It is also well settled that where a juror has been selected, a challenge can not be interposed for a cause known to the party seeking to interpose the challenge at the time of impaneling the juror. But here we have a case in which the juror mislead the court and counsel. The juror seems to have been thoroughly investigated on his voir dire in regard to his having conscientious scruples against the infliction of the death penalty, and by having answered in the negative misled counsel for the State, and upon his answer was accepted. In Horbach's case, 43 Texas, 242, Chief Justice Roberts said: "We know of no law or established practice under the law which sanctions the peremptory challenge of a juror by either party when thus placed on the jury, whether it is full or not. There may be discretion in the court for excluding or standing aside a juror after he is thus chosen for good cause shown at the time why the juror can not or ought not to serve on the jury." In Baker v. State, 3 Texas Crim. App., 525, Judge Winkler, for the court, uses this language, after approving the Horbach decision: "This clearly indicates that each person is to be examined separately and subject to challenge either for cause or peremptorily separately; and these things are to be done before the person is impaneled; and that the challenge afterwards would not be allowed except for some cause not discoverable on the examination in person and to be set out in the application for failing to make the challenge." These cases were approved in Drake v. State, 5 Texas Crim. App., 649; see also Evans v. State, 6 Texas Crim. App., 513. The same rule is approved in Mayers v. Smith, 121 Ill., 442. And in support of the same proposition see Jefferson v. State, 52 Miss., 767; McGuire v. State, 37 Miss., 369; Lewis v. State, 9 Miss., 115; 12 Enc. of Plead. and Prac., 440, note 2. So far as we are advised the rule is uniform that where the cause for challenge exists, and the juror has been interrogated in regard to it and denies the ground of challenge, and it is subsequently

ascertained that it did exist, it would constitute cause for challenge. Some of the authorities hold it is discretionary with the court and will not constitute error if that discretion is correctly exercised. In Ellison v. State, 12 Texas Crim. App., 557, it was held: "Sickness of the juror, occurring after being impaneled, would not constitute ground for setting aside the juror, but in that event the entire jury should be discharged and a new jury constituted." But that case has no application to the question at issue. Sickness of a juror is not a cause for challenge, although it might be a reason for not impaneling a juror. So we hold that, under the authorities, the action of the court in this matter was not illegal and the ruling was correct in sustaining the challenge of the State under the circumstances.

Baxter was mayor of the town of Howe, where the killing occurred, and testified that he noticed the actions of appellant near the depot in said town; that he was dancing around and hallooing, picking up rocks and gravel, and throwing them; that his gun was leaning against the house, right close to him; that he informed the marshal, McCoy, and instructed him to arrest appellant for disturbing the peace. Objection was urged because this was hearsay. Same witness also testified that the deceased (Jordan) had been acting as peace officer in the town of Howe since before Christmas; that a short time before the shooting witness saw defendant east of the depot, near some grain houses. Here the witness practically repeats the testimony as in the former bill, that these facts were communicated to the city marshal, with instructions to arrest appellant for breach of the peace. Objection was urged upon the ground that these matters did not occur in the presence of defendant, nor were they communicated to him, and because hearsay. McCoy testified, in substance, that he was instructed by the mayor to arrest defendant and he informed the mayor that he was not able himself, being sick; and the mayor instructed him to deputize persons to go with him to arrest defendant, which he did, deputizing deceased and Allsup. This was objected to because hearsay, not having been made in the presence of defendant. Further objection was urged to the testimony of McCoy to the effect that the mayor communicated to him over the phone in regard to coming down and arresting appellant, and that he came down to the town, and the mayor there instructed him to arrest defendant on the charge of disturbing the peace. This was objected to as a repetition, and because hearsay. We are of opinion that all the above testimony was admissible. If appellant disturbed the peace, the mayor could order his arrest. The disturbance occurred in his presence and hearing, and the marshal would unquestionably have the authority to summon a posse to assist in the arrest. The facts in this connection show that appellant was fully aware of the official capacity of McCoy; and the further fact that deceased had been acting as a peace officer. This occurred by reason of previous arrest of appellant and attempts on the part of Jordan to arrest him for misconduct

in the town of Howe. Appellant had ill will towards deceased and had so stated. The fact that appellant did not hear the mayor order the arrest would make no difference under the circumstances of this case. The city marshal was authorized himself to make arrest for disturbances of the peace without warrant, and he was further authorized to summon a sufficient number of citizens as a posse to assist him in making the arrest.

Appellant urged objections to the conduct of the State's counsel in placing parties in position before the jury to illustrate the relations of the parties to each other during the trouble which ended in the homicide. This was done while the witness Allsup was upon the stand —he being one of the posse summoned by the marshal and assisted in the arrest. He was fully cognizant of all the surroundings, positions of the parties, and was an eyewitness to the entire transaction. We think this was legitimate. We have been cited to no authorities to show error; and upon the same theory that the introduction of diagrams are admissible, we think this testimony was admissible.

Allsup was also permitted to testify that a great number of people go to the depot in the town of Howe, and many of them go to buy tickets, and some to "knock around." Appellant objects that the witness could not know for what purpose these parties went to the depot, as they may have gone there for other purposes and different objects, and it was calculated to prejudice the jury. This is all the bill presents. If the witness knew as a fact, and he testified that he did, that these parties went there for the purposes indicated, he could state it as such fact. We do not understand how this could have prejudiced the jury against the appellant. The bill fails to show any prejudice or what bearing it could have had upon the case that was injurious to appellant.

The confessions of appellant were introduced in evidence. The predicate for this was the testimony of Baxter, who stated that he cautioned appellant and gave him the warning. Witness states, "I told him (defendant) he had been arrested for killing Albert Jordan, and he did not have to make a statement; and if he did, it would be used as evidence against him and not for him upon the final trial. I gave him that warning immediately after he was put in the store. * * * I was not an officer—nothing more than the mayor. At the time he was put in the store he was in my charge really. The marshal was there; he brought defendant up there from the scene of the killing, about 300 yards from the store where defendant was brought. Russell, the sheriff of Grayson County, authorized me over the 'phone to take charge of defendant and lock the store. I did not see Russell. I talked to him over the 'phone. I could not tell when I got to the 'phone," etc. The grounds of objection were that the witness was not an officer and had no legal authority to warn defendant. This would be immaterial. It is not necessary as a prerequisite to the introduction of a confession that the party giving the warning should be an officer. He seems to have

been in charge of appellant, under the authority of the sheriff. We think the predicate was sufficient. About twenty minutes after defendant had been placed in the store, and about 300 yards from the difficulty, defendant made this statement: "Al (speaking to Al Allsup), you got me, but, God damn you, I got one of your men before you did." The objection is that he had not been warned; and further it was not made at the time of the arrest, but after his arrest, and after he had been taken to the store, some 300 yards distant from the difficulty, etc. He also made the same statement to Alsup about an hour after the arrest. The court qualifies each bill with the same statement, at some length setting out the warning and attending circumstances in regard to confessions. The warning, as before stated, was sufficient; and the first confession was made within about twenty minutes, and the other in about an hour after the warning, and in a conversation with the same witness Allsup. The length of time elapsing between the warning and the confession is not necessarily the criterion for the introduction or rejection of confessions. If the warning occurs and the confession is made with the warning in mind, it is inadmissible. We think this rule is well settled. We further hold that under all the circumstances this confession was sufficiently connected with the warning to admit it.

There are no exceptions to the charge. But it is urged that the evidence is not sufficient to support the extreme penalty of the law. If the testimony of the witnesses Davis, Phares and Turner is to be believed, then all the necessary facts to show express malice were clearly proved. On the day of the killing appellant had a double-barrel shotgun and remarked, in the restaurant, that he intended to kill McCoy and Albert Jordan (deceased) if they undertook to arrest him. He was armed with a double-barrel shotgun, breech-loading. "He broke his gun at the breech, so as to expose the shells. The gun was loaded and defendant said one of the shells was for McCoy and the other for Albert Jordan." The witness Phares testified that on the day of the killing he saw appellant on the railroad some distance south of Helvey, and walked into Howe with him. He had a double-barrel shotgun and several loaded shells. This was about 4 o'clock in the afternoon. "I had a conversation with him. He said that he and John Watkins had been in Howe that day, and that Watkins had gone to Sherman for some whiskey and would return to Howe on the 6 o'clock train. Watkins was a married man, living north of Howe about two and one-half miles. Defendant was living with him. Defendant said that he had been to Watkins to feed the stock and that he was on his way back to Howe to meet Watkins when he returned with the whisky. Defendant said he had been arrested his last time at Howe, and that he would kill McCoy and Allsup if they undertook to arrest him. He said he would kill anybody that looked cross-eyed at him. I asked him to lend me some loaded shells, and he handed me two No. 4 shells, and after he had

handed them to me he said, 'Those are No. 4; give them back to me; I may need them.' * * * About ten days or two weeks before this I saw deceased pursuing defendant out of town; they were running. In that conversation on the railroad, Black said he was not going to be arrested, and that Watkins had a pistol and would stick to him." Tucker stated that he lived at Howe and knows defendant. "On the day of the shooting I saw defendant at the depot, and he asked me if Albert Jordan had said anything about arresting him. I said no. He then said, 'If he undertakes to arrest me I am going to fix him.' He had a shotgun at the time." The evidence shows that late in the evening appellant was creating noise and confusion, hallooing, and throwing rocks and gravel, and had a shotgun with him. This attracted the attention of the mayor, who ordered his arrest. The marshal summoned deceased (Jordan) and Allsup, and the killing occurred in the attempt to arrest. Defendant fired the only shot during the difficulty into the body of Jordan. It is not necessary to go further into the details of the testimony attending the tragedy. We believe this evidence is sufficient to justify the verdict. There being no error in the record, the judgment is affirmed.

*Affirmed.*

### ON REHEARING.

#### June 1, 1904.

DAVIDSON, PRESIDING JUDGE.—At our recent Dallas term the judgment herein was affirmed. It is contended the opinion was in error holding the action of the trial court correct in sustaining the challenge to the juror Atkins. It is not proposed here to make a restatement of the facts in regard to this matter, but reference is made to the original opinion. This juror was thoroughly investigated on his void dire in regard to whether he had concsientious scruples against the infliction of the death penalty. He answered in the negative, and was accepted by both parties, as is shown by the statement in the bill of exceptions, and in the original opinion. This answer misled counsel for the State into accepting the juror. The question we have here sharply put is, where a cause for challenge exists, and the juror upon his voir dire denies the existence of that cause and misleads counsel into accepting him, whether or not subsequently ascertaining the fact that the cause of challenge does exist would be a reason to challenge said juror before the completion of the jury, for the record shows that there were less than twelve jurors accepted at the time the existence of the cause for challenge became known to the court and counsel. We repeat here what was said in Horbach's case, 43 Texas, 242: "We know of no law or established practice under the law which sanctions the peremptory challenge of a juror by either party when thus placed on the jury, whether it is full or not. There may be discretion in the court for excluding or

standing aside a juror after he is thus chosen for good cause shown at the time why the juror can not or ought not to serve on the jury." Baker's case, as said in the original opinion, followed the Horbach case, and uses this language: "This clearly indicates that each person is to be examined separately and subject to challenge either for cause or peremptorily separately; and these things are to be done before the person is impaneled; and that the challenge afterwards would not be allowed, except for some cause not discoverable on the examination in person and to be set out in the application for failing to make the challenge." These cases have been approved in Drake v. State, 5 Texas Crim. App., 649; Evans v. State, 6 Texas Crim. App., 517. See also authorities cited in the original opinion, as well as People v. Damon, 13 Wend., 351; People v. Wilson, 3 Parker's Crim. Rep., 202; State v. Diskin, 34 La. Ann., 919, 1 Am. St. Rep., 523, 524. We are not discussing here the question of peremptory challenges, but only challenges for cause, where the cause for challenge existed at the time of accepting the juror, but which was secreted or failed to be made known by the juror at the time, when questioned in regard to the matter.

In People v. Wilson, supra, we find this language: "After several of the jurors drawn had been challenged and set aside and one had been sworn, one Ezra Haight was called and was challenged for proper cause by the district attorney on the allegation that he was opposed to capital punishment and could not therefore conscientiously convict anyone on a charge of murder. The juror on being sworn testified that he was opposed to the punishment of death, but said in answer to a question from the court that he should, if sworn as a juror on a trial for murder and the evidence of guilt was clear, find the accused guilty. The court thereupon decided that the challenge had not been sustained, and the juror was thereupon sworn and took his seat. After another juror had been sworn and several others had been set aside, Haight, who had been laboring under considerable trepidation, addressed the court and said that he had misunderstood the question propounded to him and given a wrong answer, and that he desired to correct himself, and say that he could not under any circumstances convict one upon a charge for murder. The district attorney thereupon moved that the juror be set aside, which was opposed by counsel for the prisoner, who said that in a case of so much importance they were bound to raise every objection which would benefit the accused. * * * It was correctly held in People v. Damon, 13 Wend., 351, that a juror who, after he is sworn in chief and has taken his seat, is admitted to be incompetent to serve, may, in the exercise of a sound discretion, be set aside by the court at any time before evidence is given, and that this may be done even in a capital case, and as well for cause existing before as after the juror was sworn. In that case, however, the juror had not been previously challenged, whereas in that now before us a challenge

had been interposed and the trial has been had and the juror has been found by the court to be competent. So long as that finding stands the juror can not be discharged, and yet it would be a mere mockery of justice to suffer the trial to proceed under such circumstances and with such a juror." In the Damon case, two questions were propounded: "First, can a juror be challenged after he is sworn? Second, can a juror who has conscientious scruples against finding a verdict of guilty in a case punishable with death be allowed to serve as a juror on the trial of an indictment for an offense punishable with death, unless he belongs to a religious denomination, who as a denomination entertains such scruples? The regular practice is to challenge jurors as they come to the book to be sworn before they are sworn; but I apprehend this is a matter of practice and may be departed from in the discretion of the court. The object is to give the prisoner a fair trial, and if it be made to appear even after the juror is sworn that he is totally incompetent by reason of having prejudged the case, it is not then too late to set him aside and call another. It is indeed laid down in the old books that it can not be done. Hawkins says a juror can not be challenged after he was sworn, unless for some cause which happened after he was sworn (according to the greater number of authorities) and cites the year books." After discussing the cases, the court said: "But I apprehend no authority can be necessary to sustain the proposition that the court may and should in its discretion set aside all persons who are incompetent jurors at any time before the evidence is given." The head note of the opinion says: "A juror who after he is sworn in chief and has taken his seat is discovered incompetent to serve may, in the exercise of a sound discretion, be set aside by the court at any time before evidence is given, and this may be done even in a capital case and as well for cause existing before as after the juror was sworn."

In 9 Smedes & Marshall's Reports (Miss.), page 115, it seems that the question here at issue was involved. The head note of the decision states the matter, as we understand the case, fairly: "A proposed juror having stated that he had formed and expressed no opinion in the case, was tendered to the prisoner as a juror and accepted, when he voluntarily stated to the court that he had conscientious scruples about finding any man guilty of murder, and could not conscientiously take the oath. The court thereupon discharged him without challenge either upon the part of the State or the accused. Held, that it was the duty of the court to see that an impartial jury was impaneled and that it was composed of men above all exceptions. Therefore when the proposed juror stated his objections it was right to respect them and procure another who was not restrained by such feelings from the performance of his duty."

In State v. Diskin, 34 La. Ann., the court held, "When a juror after examination on his voir dire has been accepted by the prisoner and

sworn the court may yet discharge him upon discovering from the statement and further examination of the juror that he is opposed to capital punishment." Judge Fenner, delivering the opinion of the court, says: "After the jurors had been called to the book, had been duly examined by the district attorney on their voir dire, and had been tendered to the prisoner and accepted by him, and had been thereupon severally duly sworn, one of the jurors notified the court, through the deputy sheriff, that he had conscientious scruples against capital punishment, upon. which point he had been questioned un his voir dire. Thereupon the judge, over the objections of the prisoner, propounded to each of said sworn jurors the usual question on that subject, and two of them answering they had such conscientious scruples, he (the judge) challenged them for cause and discharged them as incompetent to serve in such cause. To which ruling and action of the court the prisoner took a regular bill of exceptions. We are not disposed to favor objections of this character, the purpose of which is not to secure but prevent trial before a fair and competent juror, which is all that any prisoner should have a right to claim. It is unquestionably the general rule, and so recognized by this court, that the proper time for both the State and the prisoner to urge objections to a juror for cause is before the juror is sworn, and the right of further question or of challenge for cause is, as a general thing, waived and lost after the swearing in by the juror. State v. Isaac, 3 La. Ann., 359; State v. Dubar, 2 La. Ann., 732; State v. Kennedy, 8 Rob., 596. Had the judge of his own motion officiously interfered by further questioning the jurors as to their qualification after they were accepted and sworn, or had permitted State's counsel to do so, and thereupon exercised the right of challenge, we would, perhaps, have enforced the rule and have considered such a proceding as an irregularity vitiating the proceeding. But all general rules have their exception, and when as in this case a juror has been sworn, of his own volition informs the court that he is subject to a cause of incompetency, as to which he and the two other jurors who have been sworn with him had not been questioned, we think it would be a mockery of common sense to hold that the court would be bound to close its ears to the information and permit the trial to proceed before an incompetent jury who could not find an unqualified verdict in favor of the State under any circumstances, however clearly the law and the facts might sustain and require it. Under such circumstances arising before the impaneling of the jury is completed, we hold that the court was justified in the exercise of its discretion to remedy the negligence thus called to its attneitno, and to examine the jurors sworn upon the matter of incompetency suggested, and to excuse those found subject to challenge for that cause. In this we are sustained by respectable authorities which go even farther than we have done. People v. Damon, 13 Wend., 351; Todel v. Commonwealth, 11 Leigh, 714; United States v. Morris, 1 Curt. C. C., 23; 3 Whart. Crim. L., sec. 3130, citing

'following additional cases: 11 Hárris, 12; 37 Miss., 369; 1 Edm. (N. Y.), Sel. Cas., 36." These authorities amply sústain the original opinion, and in our judgment lay down the correct rule.

We are relieved here of investigating the question as to how far the trial court may go in excusing jurors because of the existence of causes for challenge when the court exercises that authority of his own volition. In the case before us, the juror had answered showing he had no conscientious scruples in regard to inflicting the death penalty, thus misleading the court and counsel for both sides. This, perhaps, may have been less detrimental to defendant, but the State is entitled to a jury in a capital case not burdened with conscientious scruples in regard to inflicting the death penalty, for this is one of the modes of punishment for murder in the first degree. Where a juror has misled counsel in regard to a cause for challenge and is accepted as a juror, it would not be violative of the law, upon discovering that the cause did exist, the challenge may then be exercised, and the court would not be in error in sustaining that challenge at any time before the completion of the jury. However, we are not undertaking here to state the final time at which the matter may be investigated, or the challenge interposed. It is not necessary here to discuss that question. This, we take it, is necessary in order to guarantee a fair trial before an impartial jury, as well for the defendant as for the State. Suppose the juror had answered he had no bias or prejudice against defendant, or that he had not established in his mind a conclusion as to the guilt of defendant to such an extent that it would influence his verdict; and it was thereafter discovered he had bias or prejudice, or had formed a conclusion as to the guilt or innocence of defendant, certainly it would not preclude defendant the right to introduce his cause for challenge and rid himself of a juror who had prejudged the case, and whose bias or prejudice, was of sufficient magnitude to influence that verdict against him. Authorities are not wanting to show that where the juror has misled accused in regard to his prejudgment of the case, or his bias or prejudice against accused, that new trials have been awarded upon subsequently discovering those facts. A court of justice would be derelict in refusing a new trial under such circumstances. It would be in direct violation of the Bill of Rights which guarantees the accused an impartial jury, for under such circumstances it would not be contended for a moment that a juror whose mind was in the condition indicated would be an impartial juror. We have discussed this question only from the standpoint of this record. Peremptory challenges are not here involved, but we have the plain and simple proposition that the juror had answered he had no conscientious scruples against inflicting the death penalty, when as a matter of fact he did have. This is laid down by the statute as one of the grounds of challenge, and guarantees the State and defendant the right to challenge for this reason. Having been

misled by the juror into accepting him, the State had the right, under the circumstances, to urge the cause for challenge in the manner and at the time it was exercised.  After a careful review of the facts we are still of the opinion that the evidence does disclose a killing upon express malice aforethought.  The Reporter will state the evidence bearing upon this issue.  The motion for rehearing is overruled.

*Overruled.*

### ON REHEARING.

#### June 15, 1904.

DAVIDSON, PRESIDING JUDGE.—The motion for rehearing was overruled at a former day of this term. Appellant insists that we pass on one other question suggested, which was not specifically mentioned. The fourth ground of the motion for new trial urged in tne trial court alleges that the court, upon the special venire being exhausted, caused the jury for the week to be tendered out of which to finish the jury which was to try him.  There was no exception taken to this action of the court at the time the jury was impaneled, so far as this record shows; and the only evidence we have of the fact that this action was had on the part of the trial court is a statement of that fact as the fourth ground of the motion.  When the court overruled the motion for new trial, appellant took an exception and embodied the entire motion for new trial in a bill of exceptions.  An exception can not be taken to the manner of impaneling a jury in this manner.  It must be done at the time the jury is being impaneled, otherwise any supposed irregularities are waived.  This is sustained by an unbroken line of authorities.  If appellant did not want to select the remaining jurors from the jury for the week he could have excepted at the time they were tendered, but not having done so it was too late to urge it on motion for new trial. The exception taken to the overruling of the motion for new trial will not relate back and be taken in lieu of an exception that ought to have been urged at the proper time.  The fact that defendant embodied his exception to the action of the court overruling the motion for new trial does not place the motion for new trial in any better light than if that exception had been simply noted upon the docket.  A proper bill of exceptions must be taken when the challenge is overruled.  The motion is overruled.

*Overruled.*