EX PARTE GAITHER LOVELADY *alias* RED LOVELADY.

No. 23746. Delivered November 19, 1947.
Rehearing Denied January 7, 1948.
Appealed to the United States Supreme Court.
Petition for Certiorari Granted and Stay of Execution Ordered Pending Final Disposition of Case on April 5, 1948.
Mandate of United States Supreme Court (Upon Motion of Petitioner) Dismissing Writ of Certiorari Issued April 26, 1948.
Mandate of United States Supreme Court Dismissing Writ of Certiorari Filed in Court of Criminal Appeals May 29, 1948.

94

*Peden & Stevens,* of Houston, and *John S. Simmang* of Giddings, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

This is an original proceeding brought before the Court of Criminal Appeals by Gaither Lovelady seeking to set aside a judgment of conviction for murder in which the penalty was death.

Upon the filing of said application, on the 8th day of May, 1947, Presiding Judge Hawkins entered an order directing the Clerk to transmit the petition and all exhibits attached thereto

to the Judge of the District Court of Lee County, Texas, directing him to develop the facts touching the several issues raised and to certify said facts to the Court of Criminal Appeals, as contemplated under Article 119, Code of Criminal Procedure. The order further directed the Warden of the Penitentiary of the State of Texas to refrain from executing relator until the further order of this Court.

Appellant was indicted and tried for murder in Lee County, Texas, and upon conviction he appealed to this Court. The judgment was here affirmed by opinion reported in 198 S. W. (2d) page 570. (150 Texas Crim. Rep. 50.)

Three grounds for the relief sought are set up: FIRST, it is contended that there existed systematic exclusion of negroes from grand jury service in Lee County, all in violation of the 14th Amendment to the Constitution of the United States, and prejudicial to the rights of petitioner. SECOND, it is alleged that the jury was composed of only eleven qualified jurors in that one of the number was disqualified because of insanity. THIRD, because petitioner was denied the right to be heard and to have effective assistance of counsel. (In this he stated that petitioner employed counsel but did not have effective assistance from them; that they were incompetent and did not present his available defense or prove the bad character of the deceased. As a consequence of all of this, it is contended that his trial and conviction are contrary to the 14th Amendment to the Constitution of the United States.)

Upon receiving the certification of authority and direction to take evidence, the Honorable John H. Tate, Judge of the 21st Judicial District of Texas, proceeded to take evidence and has certified the same to this Court on the issues as summarized herein.

On the question of the systematic exclusion of negroes from the grand jury service, first presented in evidence, the record shows a list of grand jurors for the past twenty years, and that intermittently during that period of time negroes had served on the grand jury—Harvey Mitchell in 1945, Frank Taylor in 1943, John White in 1942. Frank Taylor was called as a grand juror for the October term, 1945, when petitioner was indicted, but secured his release from service by first requesting it in writing and then appearing before the court, claiming emergency work in the harvest of his peanut crop. The court had refused to excuse him upon written request and required that he come

into court and make it personally, which he did. Upon that appearance the District Judge excused him and this left the jury composed entirely of white men. Under the showing made by a lengthy statement of facts on the subject, this Court finds that there had been no such discrimination as would form the basis for the complaint made.

The next question considered in appellant's brief is based on a judgment of insanity against J. B. Gersch, foreman of the jury which convicted petitioner. It is shown by the evidence that the juror had been adjudged to be insane on the 5th day of August, 1938, and that he was confined in the State Hospital for the Insane. No judgment of restoration of sanity was entered by the court until the 30th day of May, 1946, which was subsequent to the service as a juror in the trial of petitioner. However, it is further shown that the juror was, soon after his confinement, discharged by the Superintendent in charge of the hospital in which the confinement was had and that he thereafter pursued his business in a normal way up to the present time. The testimony on the subject is lengthy and to justify our finding as a fact that he was a competent juror under the circumstances, we deem it proper to review a major portion of this evidence, which we do in the order in which it is presented.

Petitioner called Dr. W. E. York, a qualified physician, who testified that he had practiced in the family of John B. Gersch since he was a little boy, and treated the juror in 1938 for a very strong case of syphilis; that he gave him intensive treatment. They took him to a Psychiatric Hospital for treatment but he could not be admitted and was thereafter confined in the hospital at Austin. He was soon released and treatment continued until he advised him to go to a specialist in the disease from which he was suffering. The witness concluded that in his opinion Gersch was of sound mind from January 1, 1946, to January 31, 1946. He had seen him and had business dealings with him, and found that he "* * * always talked strong business with me."

Dr. Spivak, a psychiatrist for fourteen years, testified as an expert as to the general effect on the mental condition of one suffering from syphilis. He said not all cases led to insanity, but there is a percentage, and that the permanency depends upon the amount of brain tissue that is destroyed. To the hypothetical question, it was his opinion that the juror had not recovered. This is based on his belief that he did not have enough treatment. On cross-examination the doctor was given a hypo-

thetical question embracing the legal definition of insanity. This he said the medical profession would not accept, and he declined to answer the question. He had no personal knowledge of the man, because he had not treated him. He was only testifying as an expert. From the evidence which he had heard Dr. York give, he thought the patient was physically worse in 1942, and that the disease had become "permanent and fixed"; that he has a deterioration of the whole body from the amount of poison.

The State produced a number of witnesses on the subject from which we deduct the following. J. A. Burgdorf was a member of the jury that tried Lovelady. He had known the juror Gersch all of his life. Gersch worked for the government at the A.A.A. office. The juror had much business with Gersch with records and things like that. He observed him as a juror, talked with him and observed his actions, and was of the opinion that Gersch was sane.

Joe Peters, another juror, had known Gersch for a long time and had dealings with him in the A.A.A. office. He was locked up with him as a juror, while sitting on the Lovelady case, and is of the opinion that the juror Gersch was sane. Gersch was selected by the other members as foreman and acted in that capacity. He knew Gersch had a nervous breakdown once. He had seen him on the streets and in his office and talked to him as a friend. He thought he could not be mistaken about his sane condition.

Albert Schkade, another juror, had known Gersch since 1928, quite intimately. They lived in the same town. He would see him on the streets and talk with him and he was of the opinion that he was sane. Gersch displayed some nervousness with his hands—he has nervous handwriting, shaky and trembling.

W. D. Moody, who has charge of the A.A.A. office in Giddings, for Lee County, testified that he came there in 1945 and that the juror Gersch had been working for him during that time, and still is. He says Gersch has a responsible clerical position with the department which calls for accuracy in filling in forms, which is done under directions and according to instructions. From his work and his conversation during the two years, he believes the juror is of sound mind. On cross-examination he says that Mr. Gersch's work is not purely mechanical but the reports are technical and involved. His work requires interpretations of rulings handed down by superior officers. The juror is a nervous man which is expressed mostly in a physical way, principally in his hands. This is shown in his writing.

Dr. S. W. Mentzel was the physician to whom Mr. Gersch went in 1943. He discussed his physical and mental condition and agreed that if his mind had been impaired to any considerable extent the injury would not have been cured. He gave a history of the case and the reports he had on him, and concluded that he had not had enough impairment to handicap him or keep him from doing his work and making a livelihood. He says, "I don't think it has impaired him enough to where you could call him of unsound mind. I think he is carrying on his normal duties. * * * I have never noticed him when he was incompetent; * * * he always talked intelligent and was always very cooperative I think he could make decisions on vital matters; I think he could. I don't think his brain was impaired that much; even though he had some scar tissue, I don't think he had that much impairment. * * * A man wouldn't be able to hold down a job like he was holding down if he would be insane, and he wouldn't be able to think for himself. He wouldn't be able to do the clerical work he is doing; there would be a lot of mistakes in it, if he wasn't sane."

It now devolves upon this Court to determine whether or not as a matter of fact the juror had sufficient mental capacity to qualify him for jury service. In doing so, it is necessary to consider the requirements of law.

Article 616, Vernon's Ann. C. C. P., disqualifies one from service as a juror who is insane. In enacting this statute the Legislature will be construed to have done so having in mind the legal definition of insanity. As related to service of a juror, distinguished as it must be from one charged with crime who pleads insanity as a defense, one is qualified who has sufficient mental capacity to transact his own business with intelligence and who is able to form an intelligent conclusion on matters before him. It was said in State v. Camp, 158 S. E. 664, (West Virginia) that legal competency to act is possession of mental capacity sufficient to transact one's business with intelligence, and with an intelligent understanding of what he is doing. The test related to the time he rendered service as a juror. See also Wharton & Stille's Med. Jurisdiction, paragraph 246.

Burik v. Dundee Woolen Co., 49 A. 442 (Supreme Court of N. J.) discusses the phase of the question now under consideration in the following language:

"A verdict will not be set aside on the ground of the insanity of a juror who gave no evidence of unsoundness of mind before or at the trial, and took part with apparent intelligence in de-

liberation with his fellows, although not long afterwards his insanity was indisputable, and was of such a nature as probably to have existed to some extent at the time of the trial; medical opinion differing as to whether it would then have impaired his power of deliberative judgment as a juror."

This statement of the law we believe to be acceptable in all jurisdictions and it reflects our conclusion on the degree of mentality which a juror must possess at the time of the trial.

The Supreme Court of the United States, at least inferentially, takes similar position in Buchanan, Petitioner, 158 U. S. 31 (39 L. Ed. 884) from which we quote the following: "* * * the mental condition of a juror and his competency to return a verdict was a question of fact (to be determined by the trial court), and this court upon writ of error to the highest court of a State * * * cannot review."

The foregoing quoted evidence on the issue is overwhelmingly in favor of the juror's competency at the time of the trial of Lovelady. Only one witness, Dr. Spivak, who testified as an expert witness without any personal knowledge of the juror, reached the conclusion that the juror was not qualified. He based his judgment on a hypothetical question and refused to accept the legal standard for mental capacity. We think his evidence should have little, if any, probative force on the subject at issue under this circumstance and in view of the strength of the State's evidence.

It is our conclusion that the juror Gersch, who acted as foreman of the jury, was of sound mind and had capacity sufficient to qualify him as a juror at the time of the trial.

The more earnest contention, however, is based on the proposition that the juror was disqualified as a matter of law, because the judgment of insanity against him had not been set aside by legal proceedings in the courts. In this state of affairs the burden is generally cast upon the State, in the trial of criminal cases, to show the mental capacity of one charged with crime. It is never held to be conclusive proof of insanity and we think it should not be so considered here. This Court has passed on the question in Carter v. State, 278 S. W. 840, in an opinion by Judge Berry, then a commissioner. The question of the mental capacity of a juror was raised by Carter on a motion for new trial. The juror had been confined in the insane asylum at Terrell and had never been discharged there-

from. The fact was not known to the accused at the time of the trial. It is held that the question is one of fact "* * * for the court to decide as to whether or not the juror was insane, and the judgment of the court, adjudging him so, was not conclusive." We quote further from this opinion as follows:

"He may have recovered therefrom and been of normal mind, and, in order to show that he had recovered, it was not necessary to show that he had been legally discharged from the asylum. Evidence was heard upon this issue, and the same was conflicting. The evidence for the state was amply sufficient, if believed, to show that the juror was of sound mind. Under this condition of the record, we are not authorized to say that the court abused his discretion in refusing to grant a new trial on account of this matter."

The third question, in our opinion, presents no difficulty. The petitioner employed lawyers, one of whom seems to have been known to his relatives, who conferred with the lawyers and assisted in arranging finances for their employment. There is no evidence to show that these lawyers were not in good standing in their profession and qualified to represent Lovelady on his trial. A great number of witnesses were introduced for the purpose of showing the bad character of the deceased. This was to show that the defense lawyers were incompetent because they did not raise an issue and make this proof at the trial. To controvert this, the State brought witnesses who gave deceased a good reputation as a citizen and as a peace officer. They denied each and every charge brought against him, with plausible evidence by responsible witnesses. It is our opinion that petitioner failed to sustain the charge of the incompetency of the lawyers by raising this issue, if in fact it had any place and purpose.

It is further contended that petitioner had a defense which was not made an issue, in that he was illegally arrested and was first attacked by the officer whom he killed. An unlawful arrest would justify the killing to extricate himself and the attack would raise an issue of self-defense. The conduct of his attorneys in not raising these issues is presented as a ground for the allegation of incompetency. The arrest was for drunkenness and, therefore, lawful. Without admitting the necessity for considering this evidence, or the right of petitioner to challenge the competency of the attorneys of his own selection, whom he retained to conduct his case not only in the trial before a jury but on appeal to this Court, we are nevertheless of the opinion that the record fails to sustain the contention, even when con-

sidered in its fullness. Taking judicial knowledge of the case presented to this Court on appeal, reliance was had on the failure of the State to make a case, based on the contention that the statement of deceased, as to who shot him, was not admissible. We overrule that contention but it must be recognized as one with some merit. If the accused had been placed on the stand and testified, as counsel now contends should have been done, the question of the admissibility of the State's only evidence connecting him with the murder would have been entirely destroyed. We are unable to say, under all of the circumstances of the case as the evidence is now presented to us, that his attorneys did not choose the most available defense. That defense was presented to this Court. Whether or not it was skillfully done we are not called upon to judge in this proceeding.

Having concluded that petitioner has failed to sustain his contentions that any negroes were excluded from service on the grand jury that indicted him, by reason of their race, creed or color, or that said grand jury was improperly selected; that the petit jury before which he was tried was composed of only eleven qualified jurors, as a consequence of which the judgment assessing the death penalty was void; and that he was denied the right to be represented by counsel as guaranteed by the Constitution of the United States, it is the order of this Court that the petition be in all things denied.

The Clerk of this Court will transmit this order to the Warden of the Penitentiary, which shall have the effect of relieving him of the restraint from executing the said Gaither Lovelady in obedience to the mandate of the court requiring him to do so.

### ON RELATOR'S MOTION FOR REHEARING.

DAVIDSON, Judge.

In his motion for rehearing, relator insists that the unvacated judgment adjudicating the juror Gersch insane disqualified him from jury service to the same extent and in the same manner as though he had been convicted of a felony.

As controlling in the trial of criminal cases, an insanity judgment fixes the mental status as of the time the judgment is entered. Until the judgment is set aside or vacated, the presumption attains that the insanity continues. Such presumption, however, may be overcome by proof that the in-

sane condition no longer exists and that the individual has regained his sanity. Glover v. State, 125 Tex. Cr. R. 605, 69 S. W. (2d) 136; Gunter v. State, 139 Tex. Crim. Rep., 145, 139 S. W. (2d) 116; Murray v. State, 147 Tex. Cr. R. 474, 182 S. W. (2d) 475.

In the instant case, the facts abundantly support the conclusion that the juror Gersch had regained his sanity and was sane at the time he served upon the jury.

We have again examined the entire record in the case and remain convinced of the correctness of our original conclusions.

The motion for rehearing is overruled.

Opinion approved by the Court.