**Jeffery Allen BARNEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69095.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 2, 1985.

Ronald Mock, Mary Moore, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and William J. Delmore, III, Donald A. Smyth and Charley Davidson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

This is an appeal from a conviction for capital murder. Appellant was convicted of intentionally causing the death of another while in the course of committing or attempting to commit the offense of aggravated rape. V.T.C.A. Penal Code, § 19.-03(a)(2). The sufficiency of the evidence to sustain the conviction is not challenged. The jury returned affirmative answers to two special issues submitted in accordance with Art. 37.071(b), V.A.C.C.P. The trial court sentenced appellant to death. Article 37.071(e), V.A.C.C.P. We affirm.

In his sixth ground of error, appellant contends the evidence is insufficient to support the jury's affirmative answer to the second punishment issue requiring the State to prove beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a continuing threat to society. A recital of the guilt and punishment evidence thus becomes necessary.

The deceased was the wife of John T. Longsworth, a minister in Pasadena, Texas. Appellant was Longsworth's former employee. The record reflects Longsworth had taken a charitable interest in appellant prior to the instant offense and had previously helped appellant obtain parole from the penitentiary, find employment, and gain admittance into a halfway house.

The partially nude body of the deceased was found in the bedroom of her home during the morning of November 25, 1981. The house revealed no signs of forced entry. A microphone cord was wrapped tightly around the victim's neck. Four broken ribs on the victim's left side were consistent with her assailant leaning or kneeling on her chest. The cause of death was asphyxiation by ligature strangulation. There was also evidence of manual strangulation. Medical testimony established it would take over three minutes for an individual to die from this type of strangulation. Medical evidence indicated the deceased was raped vaginally while she was alive and sodomized anally after she was dead or in shock. The record reflects Longsworth was attending an out-of-state minister's convention at the time of the instant offense.

On November 28, 1981, appellant was arrested while driving the deceased's automobile in Dayton, Ohio. Appellant was in possession of one of Longsworth's credit cards. Credit card receipts bearing the forged signature of Longsworth were recovered from the car.

Appellant subsequently gave a written statement to Pasadena police officers in which appellant stated he went to the deceased's residence, choked her after she angered him by a remark, and partially removed her clothing. He also admitted

taking some cash, a credit card, and the deceased's automobile.

At the punishment phase of trial, the State introduced evidence that appellant had twice been convicted for auto theft, once in Ohio and once in Texas. Additionally, the State called appellant's former cellmate who had spoken with appellant while in the county jail. The former cellmate testified appellant told him "he raped and strangled a preacher's wife and he stole her car and went to Ohio" and he would do it over again and he "hated the fucking bitch." The State also produced a prisoner who shared the courthouse holdover cell with appellant during his capital murder trial. This witness testified that appellant stated "[I]f I had to do it again, I would kill the bitch again."

The record further reflects that while in the courthouse holdover cell during the guilt stage of his trial, appellant was seen in possession of a homemade knife or shank. A fellow prisoner wrote a note to the bailiff warning him of the weapon and the knife was subsequently recovered from the cell's toilet. Two prisoners testified to seeing appellant with the shank and another testified he saw appellant place the shank inside the toilet. One prisoner testified that appellant stated if he got a chance he would escape and he would harm the bailiff if he had to. The prisoner also testified appellant discussed the location of the courthouse elevators and stairway, as well as whether the bailiff was armed.

██ In answering the special issues under Art. 37.071, V.A.C.C.P., the jury may consider all of the evidence adduced at the guilt stage of trial. *Smith v. State,* 683 S.W.2d 393 (Tex.Cr.App.1984); *Roney v. State,* 632 S.W.2d 598 (Tex.Cr.App.1982); *Garcia v. State,* 626 S.W.2d 46 (Tex.Cr. App.1982); *Duffy v. State,* 567 S.W.2d 197 (Tex.Cr.App.), *cert. denied,* 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978). Indeed, we have recognized that the circumstances of the offense and the facts sur-

rounding it may furnish greater probative evidence than any other evidence regarding the second special issue submitted at the penalty stage of a capital murder trial. *Russell v. State,* 665 S.W.2d 771 (Tex.Cr. App.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984); *Garcia,* supra; *Duffy,* supra.

At the punishment phase of trial, the State initially reoffered all evidence presented at the guilt phase.[1] This evidence showed that while Longsworth, a man who had taken a charitable interest in appellant, was out of town, appellant gained entry into his house and strangled the deceased with his hands and a microphone cord, slowly causing her death. Appellant raped the victim and sodomized her dead or dying body. Appellant then stole the deceased's car and Longsworth's credit card and fled to Ohio. Forging Longsworth's signature, appellant repeatedly used the stolen card.

██ This deliberate and brutal murder coupled with appellant's subsequent callous conduct evidences a total lack of regard for the sanctity of life, ownership of property, and respect for the personal dignity of individuals who had gone out of their way to help appellant. See, *Cannon v. State,* 691 S.W.2d 664 (Tex.Cr.App.1985). Appellant's deviate sexual intercourse with the victim's dead or dying body evinces a dangerous aberration of character. We have held that the circumstances of the capital offense itself, if severe enough, can be sufficient to sustain an affirmative finding to the special issue. *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr.App.1979), *cert. denied,* 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980). We need not rely upon the instant offense alone, however, for the record reflects more.

Appellant's violent tendencies were not diminished by his arrest and capital prosecution. Appellant expressed a total lack of remorse for the instant offense and assert-

---

1. Appellant's contention that the State failed to reoffer the guilt phase evidence is rebutted by the record (SF Vol. XXI, p. 492).

ed a willingness to repeat the crime, even during the pendency of his trial. Furthermore, the most compelling evidence of future dangerousness derives from appellant's conduct during the guilt stage of his capital murder trial in possessing a homemade weapon, plotting an escape from custody, and contemplating the harm of the courthouse bailiff. Evidence of this planned escape was admissible at the punishment phase of appellant's capital murder trial as bearing on appellant's future dangerousness. See Art. 37.071(a), V.A.C. C.P.; *Rumbaugh v. State*, 589 S.W.2d 414 (Tex.Cr.App.1979). Cf. *Turner v. State*, 685 S.W.2d 38 (Tex.Cr.App.1985).

Reverend Longsworth, appellant's mother, sister-in-law, and friends testified on his behalf at the punishment hearing. The record reflects little mitigating evidence for the conduct of the 23 year old appellant, other than his youth and evidence indicating he may have been intoxicated at the time of the offense. An accused's youth alone will not prevent the imposition of the death penalty. *Cannon*, supra; *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App.1978), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2870, 61 L.Ed.2d 304 (1979). Although there was evidence indicating appellant may have been intoxicated at the time of the offense, the jury could conclude this was not sufficient to mitigate his actions. See *Duffy*, supra at 208.

We find the evidence is sufficient to support the jury's affirmative finding that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. Appellant's sixth ground of error is overruled.

In his seventh ground of error, appellant contends his confession was involuntary and the trial court erred in admitting it into evidence. Appellant alleges his confession was involuntary because he was afforded little or no sleep between his arrest in Dayton, Ohio and the time of the confession given at least twenty-four hours later

in Pasadena, Texas. Additionally, appellant asserts that he was threatened with additional charges, that he requested an attorney but was denied one, and that he was warned by the magistrate regarding only an auto-theft case (the theft of the deceased's vehicle). Appellant contends the confession was not a result of his own free will given these factors and the emotionally coercive practice of police interrogation, citing *Jurek v. Estelle*, 623 F.2d 929 (5th Cir.1980), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).

Appellant filed a motion to suppress his confession and the trial court held a hearing in compliance with *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and Art. 38.22, V.A.C.C.P. The record reflects that appellant was arrested in Dayton, Ohio on November 28, 1981, while driving the deceased's car. Detective William Lanier of the Pasadena Police Department testified that he arrived in Dayton, Ohio around midnight on December 1, 1981. The next day, Lanier and another detective transported appellant from the city jail to the airport, arriving at approximately 5:30 p.m. on December 2, 1981. These two detectives accompanied appellant from Dayton to Houston, with a one hour layover in Atlanta, Georgia. Lanier testified that even though appellant desired to talk with them during the flight, they refused to discuss the case with appellant. Lanier testified that they arrived in Pasadena around midnight, December 2, 1981, and he did not give appellant *Miranda* [2] warnings before or during the trip from Dayton. Appellant was booked into the Pasadena jail under an auto theft warrant.

Appellant was warned by a magistrate at 8:45 a.m. on December 3, 1981. See Art. 15.17, V.A.C.C.P. Shortly thereafter, Lanier spoke with appellant regarding the instant offense. Lanier testified he informed appellant he was a suspect in a capital murder case and read appellant his warnings from a "blue card." Lanier testified appellant indicated he understood his rights. After initial interrogation lasting

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

30 to 40 minutes, Detective Lanier typed appellant's confession as he gave it. This process took approximately one hour.

The top portion of the first page of appellant's confession contains the statutory warnings required by Art. 38.22, V.A.C. C.P. Lanier testified that after typing the confession he instructed appellant to read it and left the room. Lanier testified that upon his return appellant said he finished reading the statement, understood and agreed with it, and understood his rights. Lanier and others witnessed the signing of the confession. The document indicates that it was made at 9:50 a.m. on December 3, 1981. Lanier testified appellant never requested an attorney, no promises or threats were made to appellant and the confession was not coerced. Lanier further testified appellant looked rested and well-slept.

Appellant testified that he slept while in custody in Dayton, Ohio. Appellant confirmed Lanier's testimony that even though he wished to know "what all he was supposed to have done," the detectives refused to talk with him during the flight from Dayton to Houston. Appellant testified he had no sleep between his departure from Dayton until the time he gave his confession. Appellant testified someone in a suit came by the Pasadena jail and asked a group of prisoners how they wanted to plead. Appellant testified that he responded he wanted a lawyer but was returned to his cell without seeing an attorney. Appellant did not recall being warned at that time.

Appellant testified he did not remember Detective Lanier reading him his rights prior to the taking of the confession. Although appellant denied being told by Lanier that he was a suspect in a capital murder case, he testified Lanier told him he was a suspect in a murder case and "they could send me to prison for the rest of my life or give me the death penalty." Although appellant testified Lanier told him "about some girl being strangled in a motel" and told him they were going to charge him in that case, appellant also tes-

tified the police did not promise him anything in return for his confession and did not threaten him. Appellant testified he did not read the confession prior to signing it, but merely "looked at it" and turned the pages.

Municipal Court Judge Hay testified he gave appellant his statutory warnings at 8:45 a.m. on December 3, 1981. Judge Hay testified his usual procedure was to indicate on the warning form if an accused requests an attorney and no such notation was made in appellant's case. Judge Hay testified he warned appellant that he was charged with the offense of auto theft.

The record reflects appellant had an eighth grade education and a general equivalency diploma. Appellant testified he could read and write, and indeed did read the entire confession during the suppression hearing and stated he understood its contents.

The trial judge has filed findings of fact and conclusions of law regarding appellant's confession in accordance with Art. 38.22, § 6, V.A.C.C.P. The trial court found appellant made a knowing and intelligent waiver of his rights after being properly admonished by the magistrate and the interrogating officer. The trial court found the confession was voluntarily made without any threats, promises, or undue influence.

■ The determination of whether a confession is voluntary must be based upon an examination of the totality of the circumstances surrounding its acquisition. *Barton v. State,* 605 S.W.2d 605 (Tex.Cr.App. 1980); *Berry v. State,* 582 S.W.2d 463 (Tex. Cr.App.1979).

■ The trial judge at the *Jackson v. Denno* hearing is the sole judge of the weight and credibility of the witnesses. *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr. App.1983).

"It is well settled that at a hearing on the admissibility of a confession, the trial court is the trier of facts and judge of the credibility of the witnesses and the weight to be given their testimony; he

can accept or reject the testimony of witnesses, including a defendant, in determining the issues before him."
*Kelly v. State,* 621 S.W.2d 176, 179 (Tex.Cr. App.1981). See also *McKittrick v. State,* 541 S.W.2d 177 (Tex.Cr.App.1976) and cases cited therein at 184.

 Appellant's testimony that he requested an attorney is contradicted by the magistrate's testimony that he did not note any request made by appellant. Even though the magistrate warned appellant that he was charged with auto theft, the appellant's testimony indicates that prior to giving the confession, he was aware he was a suspect in a "murder" case and the possible punishment was death. Moreover, the fact that a defendant is arrested on one charge and warned concerning said charge and engages in conversation with interrogating officers about other offenses and admits one not yet charged does not render his confession thereto void. *Simpson v. State,* 603 S.W.2d 862, 865 (Tex.Cr.App. 1980). See also *Carter v. State,* 445 S.W.2d 747 (Tex.Cr.App.1969). Appellant testified he was not promised anything in return for his confession nor was he threatened. Appellant was not subjected to lengthy and constant interrogation, as the total elapsed time between the magistrate's warning, the initial interrogation, and the signed three page confession was slightly over one hour. Moreover, although appellant testified that he did not sleep from the time he left Dayton until the confession

was given, approximately sixteen hours, there is no evidence that the officers "deprived" him of sleep or that he requested sleep before confession. There was testimony that at the time of the confession, appellant appeared to have slept well, and did not appear groggy or sleepy. Lack of sleep for sixteen hours will not alone render appellant's confession involuntary.

 We find that, under the totality of the circumstances, the evidence supports the trial court's finding that appellant's confession was freely and voluntarily given after he had been fully apprised of his rights and affirmatively waived those rights. Appellant's seventh ground of error is overruled.[3]

In two grounds of error, appellant alleges the trial court erred in continuing trial with the original twelve jurors after juror Payne indicated she could not be fair and impartial because of personal problems. In his first ground of error, appellant asserts the trial court erred in denying his motion for mistrial and allowing juror Payne to continue service on the jury. In his fourth ground of error, appellant alleges the trial court erred in proceeding with juror Payne when she could have been replaced with an alternate juror.

The record reflects voir dire examination in the instant case began on April 5, 1982, and Payne was selected as the fifth juror on April 16, 1982. The voir dire examination was completed on May 12, 1982, after

**3.** We do not find the unique facts and limited holding of *Jurek v. Estelle,* supra, controlling in this case. The Fifth Circuit was careful to explain the limited holding in n. 7, *viz:*

"It must be stressed that our holding breaks very little new ground, if any, in terms of the law concerning voluntariness; under the totality test, we have considered factors which have been established as relevant to this inquiry. The absence of one or more of them might have compelled a contrary result. The precise holding of this opinion, based on an analysis of the cumulative impact of these factors, is no more or less than the following: Where a (1) mentally deficient accused, who was (2) functionally isolated from all but his interrogators, (3) who was not assisted by counsel, (4) and who had executed a valid confession to murder, essentially solving the

crime under investigation, was (5) the subject of continuing purposeful and suggestive interrogation directed (6) toward an amendment of his earlier confession to include information so minimally suggested as to amount to a prosecutorial 'hunch,' the renewed interrogation producing (7) a confession which is facially suspect and which (8) achieves the precise result sought by the prosecutors, (9) enhancing, in a manner unknown to the accused, the potential penalty to that of death, a consideration which would cause any person made aware of it to pause and carefully consider the truthfulness of any additional information suggested, the risk of involuntariness is so great that the confession cannot be admitted in consistency with due process guarantees and the privilege against self-incrimination."

twelve jurors and two alternate jurors were selected. See Art. 35.26, V.A.C.C.P.

Trial commenced on May 14, 1982. The record reflects that prior to the commencement of the second day of trial, juror Payne sought to be excused from jury service because of personal problems. Payne was brought before the bench and examined by the State and the defense. Thereafter, defense counsel stated that she did not believe juror Payne had any disability under the law, but nevertheless moved for a mistrial because Payne had indicated that she could not be a fair and impartial juror due to her personal problems. The trial court denied the motion for mistrial and denied the juror's request to be excused. Exception was taken to the trial court's denial of the motion for mistrial. No objection was made to the court's finding that Payne was not disabled from sitting as a juror. The record further reflects that, prior to the calling of the next witness, the attorneys again approached the bench and the following colloquy occurred:

> "[Prosecutor]: Your Honor, does it make any difference—just for purposes of the record, the State would agree to excuse Ms. Payne, in view of the fact that the defense has moved for a mistrial, and the fact that we have two alternates, the State would agree to excuse Ms. Payne on the basis of her answers if the defense would be satisfied.
>
> "[Defense Counsel]: No, sir."

In his first ground of error, appellant contends the trial court erred in denying his motion for mistrial and permitting juror Payne to continue service on the jury. Appellant asserts Payne was "disqualified" due to her purported inability to be fair and impartial and do her duties as a juror.

Article 36.29(b), V.A.C.C.P., provides:

> "(b) If alternate jurors have been selected in a capital case and a juror dies or becomes disabled from sitting at any time before the charge of the court is read to the jury, the alternate juror whose name was called first under Arti-

cle 35.26 of this code *shall* replace the dead or disabled juror. Likewise, if another juror dies or becomes disabled from sitting before the charge of the court is read to the jury, the other alternate juror shall replace the second juror to die or become disabled." [4] (Emphasis added.)

The record reflects two alternate jurors were selected in this case in accordance with Art. 35.26(b), V.A.C.C.P. By the express terms and mandatory language of Art. 36.29, supra, if juror Payne was in fact "disabled" within the meaning of the statute, the relief to which appellant was entitled was replacement by an alternate juror. Appellant was not entitled to the more disruptive relief of a mistrial, which was demanded to the exclusion of any other relief. Appellant's first ground of error is overruled.

In his fourth ground of error, appellant contends the trial court erred by proceeding with juror Payne when it could have replaced her with an alternate juror. As previously noted, appellant did not object to the trial court's finding that juror Payne was not disabled from sitting on the jury. Indeed, defense counsel stated she did not believe juror Payne had any disability under the law. Failure to object at trial waives error, if any. *Esquivel v. State,* 595 S.W.2d 516 (Tex.Cr.App.) *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). Moreover, appellant refused the State's offer to excuse juror Payne and replace her with one of the two alternate jurors, the appropriate remedy under Art. 36.29(b), supra. Appellant cannot now complain that an alternate juror should have been seated. Appellant's fourth ground of error is overruled.

In his second ground of error, appellant contends the trial court erred in denying his challenge for cause of veniremember Emil Matura, thus forcing appellant to exercise a peremptory strike. At trial, appellant failed to allege some fact

**4.** Acts 1981, 67th Leg., p. 2264, ch. 545, effective June 12, 1981.

which rendered Matura incapable or unfit to serve on the jury in accordance with the reasons set forth in Art. 35.16, V.A.C.C.P. See *Garcia v. State*, 626 S.W.2d 46, 56 (Tex.Cr.App.1981). Thus, nothing is preserved for review. Moreover, since appellant states no grounds for the challenge in his brief, he has not clearly identified the point of objection and thus does not comply with Art. 40.09, § 9, V.A.C.C.P. We nevertheless proceed to its review in the interest of justice. *Carter v. State*, 656 S.W.2d 468 (Tex.Cr.App.1983).

It appears from the record that appellant's challenge for cause was based upon veniremember Matura's anticipated difficulty in disregarding an unlawfully obtained confession. Under Art. 38.23, V.A.C.C.P., if the issue is submitted to the jury and the jury believes, or has a reasonable doubt, that the evidence was obtained in violation of the constitution or laws of the State of Texas or the United States, the jury shall disregard any such evidence so obtained. Thus, a juror unable to disregard an unlawfully obtained confession would be subject to challenge for cause under Art. 35.16(c)(2), V.A.C.C.P.

When examined by the prosecutor, veniremember Matura indicated he understood and agreed with the requirements for a valid confession. Matura stated unequivocally that he could follow the law, disregard an illegally obtained confession and not consider it for any purpose. Matura was responding to the law stated both as an abstract matter and as contained in a hypothetical example. Presented with a second, more difficult hypothetical situation, Matura initially indicated he could not acquit a defendant despite the confession. Upon further questioning by the prosecutor, however, Matura stated that he would follow the law, disregard the unlawfully obtained confession, and acquit the defendant if necessary.

During voir dire by defense counsel, Matura was presented with still another more difficult hypothetical situation. Matura responded "[N]o, I guess not" when asked if he could disregard the confession and "cut him loose" under the facts of the hypothetical. When asked if he could "let that killer go," Matura responded negatively and said he would have to follow his conscience. Defense counsel challenged veniremember Matura for cause. The State rehabilitated veniremember Matura, as follows:

"[Prosecutor]: Sir, would you convict somebody on a crime based on speculation and illegally obtained evidence?

"Mr. Matura: No.

"[Prosecutor]: Well, that is what you have told us that you would do.

"Mr. Matura: No.

"[Prosecutor]: That you will not disregard that illegally obtained confession, that you would, you know, whatever your answer is is fine with me.

"Mr. Matura: I just didn't understand.

"[Prosecutor]: I don't want you to be dishonest with us or yourself.

"Mr. Matura: No.

"[Prosecutor]: But what we have set up with you is a hypothetical where you are going to have to convict the guy on illegally obtained evidence or speculation or coincidence because you feel in your heart that he did it rather than on solid evidence that he did do it. And if you would convict somebody based on an illegally obtained confession because you think he did it without having solid evidence, then that is fine. But if you would, you know, you need to let us know that, one, either you can disregard an illegally obtained confession and follow the law, and if he has to be let go, then you just have to do it even though your conscience does bother you, or that you would disregard the law and find somebody guilty even if the confession was illegal and you didn't have enough evidence to do it otherwise. So, what do you do? Would you disregard the law or would you follow the law?

"Mr. Matura: I would follow the law. I just didn't understand it, I guess.

"[Prosecutor]: It is a hard thing. We are putting you in a hard hypothetical. So, tell Mr. Mock [defense counsel],

tell myself, tell the Judge whether or not you will follow the law.

"Mr. Matura: Sure.

"[Prosecutor]: In the situation of an illegally obtained confession, you could disregard it irrespective of the outcome, the fact that somebody has to be let go even if he is a vicious baby killer or, no, you couldn't be put in that position. Will you follow the law or would you disregard it?

"Mr. Matura: I would follow the law.

"[Prosecutor]: And disregard the confession?

"Mr. Matura: Yes."

Thereafter the trial court denied appellant's challenge for cause of veniremember Matura. Defense counsel resumed questioning on the subject:

"[Defense Counsel]: So I may be clear in my example—I wasn't trying to confuse you, but as far as the example I talked to you about, you could let that person go?

"Mr. Matura: Sure.

"[Defense Counsel]: You could let them go back on the streets?

"Mr. Matura: Yes."

No further challenge was offered by appellant and the voir dire examination continued on other matters. At the conclusion of the voir dire, the State accepted Matura. Appellant then had Matura excused with a peremptory strike.

■ Appellant contends that the trial court abused its discretion in denying the challenge for cause on this "equivocating juror," and that there was an inadequate effort made to rehabilitate Matura's equivocation. We disagree. While it is true, as appellant asserts, that veniremember Matura's responses varied somewhat depending upon the identity of the examiner, some of this vacillation may have occurred because Matura "just didn't understand." While this Court has only a cold record before it, the trial judge reviewing the answers of the venireman had the opportunity to observe the tone of voice and demeanor of the prospective juror in determining the precise

meaning intended. See *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr.App.1985), and *Bird v. State*, 692 S.W.2d 65 (Tex.Cr.App. 1985). See also *Garza v. State*, 622 S.W.2d 85 (Tex.Cr.App.1981) (Opinion on Rehearing); *Tezeno v. State*, 484 S.W.2d 374 (Tex. Cr.App.1972). See also *Wainwright v. Witt*, —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Given Matura's repeated assertions that he was capable of following the law as contained in Art. 38.-23, V.A.C.C.P., by disregarding the confession if it was obtained unlawfully, we cannot say the trial court erred in denying the challenge for cause. Appellant's second ground of error is overruled.

■ In his third ground of error, appellant complains the trial court erred in forcing him to accept an objectionable juror by refusing to grant an additional peremptory strike. The record reflects that appellant had exhausted all fifteen peremptory strikes available under Art. 35.15, V.A.C.C.P., as well as an additional peremptory strike granted by the court. The trial court denied appellant's request for a second extra peremptory strike.

We have already concluded that veniremember Matura was not subject to challenge for cause. It follows that appellant was not wrongfully deprived of a peremptory challenge upon a veniremember who was subject to challenge for cause or forced to accept such a veniremember as a juror. Thus, the trial court did not abuse its discretion in denying appellant's request for an additional peremptory challenge. *Barefoot v. State*, 596 S.W.2d 875, 886 (Tex.Cr.App.1980), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981); *Von Byrd v. State*, 569 S.W.2d 883, 892–93 (Tex.Cr.App.1978), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073 (1979). Appellant's third ground of error is overruled.

In two grounds of error, appellant complains of the admission of an extraneous offense during the guilt stage of trial. The record reflects that appellant's motion in limine was granted by the trial court prohibiting any proof or mention by the State

of prior convictions, extraneous offenses, arrests, or pending cases against appellant during the guilt stage of trial. During the direct testimony of State's witness Robert McDonald, who testified about threats made by appellant against the deceased, the following colloquy occurred:

"Q. Did Jeff Barney know Ruby M. Longsworth during her lifetime?

"A. Yes, he did.

"Q. Were you aware of the relationship between Ruby M. Longsworth and Jeffery Allen Barney?

"A. By what he has told me.

"Q. Did Jeff Barney indicate to you that he and Ruby Longsworth were not on the best of terms?

"A. Right.

"Q. That they weren't real friendly?

"A. Right.

"Q. Did Jeff tell you why they weren't real friendly?

"A. Well, mainly the reason that she didn't like him because he was an ex-con and—

. . . . .

"[Defense Counsel]: We would object to that last answer and ask it be stricken, number one.

"The Court: Objection will be sustained. The jury is instructed to disregard it.

"[Defense Counsel]: We move for a mistrial.

"The Court: Denied. Sir, listen to each question and answer only the question."

In his fifth ground of error, appellant contends the trial court erred in denying his motion for mistrial after the introduction of an extraneous offense in violation of his motion in limine. Appellant asserts that the reference to him as an "ex-con" would be widely taken as referring to a person who had been incarcerated in prison, and thus the jury was improperly informed of a previous felony conviction.

Certainly, an accused may not be tried for some collateral crime or for being a criminal. *Bordelon v. State,* 683 S.W.2d 9 (Tex.Cr.App.1985); *Williams v. State,* 662

S.W.2d 344 (Tex.Cr.App.1983), and cases cited therein at 346. We agree that the instant response was an improper reference to an extraneous offense.

Not every improper response, however, requires reversal. Except in extreme cases, if a timely objection to the remark is sustained, and the trial court instructs the jury to disregard, the error is cured. *Coe v. State,* 683 S.W.2d 431 (Tex. Cr.App.1984); *Thompson v. State,* 612 S.W.2d 925 (Tex.Cr.App.1981); *White v. State,* 610 S.W.2d 504 (Tex.Cr.App.1981).

We find that the court's instruction to disregard the statement cured any error accruing from the witness' answer. Appellant's fifth ground of error is overruled.

In his eleventh ground of error, appellant asserts that the introduction of the extraneous offense by State's witness McDonald shifted the burden of proof to the defense. Appellant contends that the testimony required him to put forth evidence to deny, refute, or explain the testimony. Since the trial court instructed the jury to disregard the remark, nothing was before the jury for appellant to deny, refute or explain. Appellant's eleventh ground of error is overruled.

In his tenth ground of error, appellant alleges that it was error to prohibit additional funds for investigation in this case. The record reflects that on February 11, 1982, the trial court held a hearing on pretrial motions, where appellant's written "Motion for Investigator" was granted, and appellant's written "Motion for Additional Funds for Investigation" was denied. After the court denied appellant's motion, the following colloquy occurred:

"[Defense Counsel]: ... May we have leave of the Court, if we start to run up expenses, to come back to the Court and if we can justify the expenses to the Court, we can come back to the Court?

"The Court: You can come back to the Court, Counsel, but there is absolutely no Statutory Provision for paying over five hundred dollars."

Article 26.05, § 1(d), V.A.C.C.P., provides for the payment of "expenses incurred for purposes of investigation and expert testimony, a reasonable fee to be set by the court but in no event to exceed $500." Under Art. 26.05, counsel is entitled to reimbursement of investigation expenses only after they are incurred and even then reimbursement is at the trial court's discretion. *Wallace v. State*, 618 S.W.2d 67 (Tex.Cr.App.1981). Refusal to pay expenses before they are incurred is not an abuse of discretion. *Id.* See also *Eggleston v. State*, 422 S.W.2d 460 (Tex.Cr.App.1967).

Initially, the record lacks evidence showing that appellant exhausted the $500.00 allowed under the statute, or that he incurred expenses exceeding that amount. Thus, the trial court did not abuse its discretion by denying appellant's request for additional funds at the pre-trial hearing.

Moreover, it is well settled that a defendant complaining of improper action under Art. 26.05 must present and preserve evidence in the record of harm or injury. *Reed v. State*, 644 S.W.2d 479 (Tex.Cr.App. 1983); *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980), cert. denied 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 432 (1981); *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr. App.1980); *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977); *Cherry v. State*, 488 S.W.2d 744 (Tex.Cr.App.1972). The record must reflect some specific need for the funds, such as the need for a particular expert or witness, or in what manner the defendant will be harmed if the testimony is not presented.

In his brief, appellant asserts only that he was "precluded from presenting other witnesses from his hometown in Ohio and from locating witnesses to testify for him at the punishment phase." The record, however, lacks evidence by way of affidavit or testimony of any expert or witness whose testimony would be favorable to appellant but who could not testify because of lack of funds. Thus, no harm is shown. Appellant's tenth ground of error is overruled.

In his eighth ground of error, appellant contends the trial court erred in denying his motion for continuance sought during the punishment phase of trial.

The record reflects that on May 19, 1982, the final day of the guilt stage of appellant's trial, a homemade knife was discovered in the courthouse holdover cell where appellant was confined. On May 20, 1982, at the beginning of the punishment hearing, appellant's counsel made an oral motion for continuance seeking additional time to investigate the facts and circumstances of the incident. The trial judge ruled the State could proceed with its case on punishment and the court would grant the motion if it later appeared necessary. The State then presented three punishment witnesses that testified to matters unrelated to the knife incident. Afterwards, the trial court took a noon recess.

The record reflects that appellant filed a written motion for continuance at 12 o'clock on May 20, 1982, seeking additional time for investigation of the incident. At 1:30, the court reconvened and appellant again urged his motion for continuance. At that time, the State supplied appellant with the names of all possible witnesses to the incident who were not going to be called. The names of those persons who were going to be called by the State were withheld for security purposes. The trial court then denied appellant's motion and the State presented evidence of the planned escape and discovery of the homemade knife. At the conclusion of this evidence the State rested. After appellant had called one punishment witness the proceedings were adjourned for the day. The next day appellant presented the remainder of his punishment evidence.

Article 29.13, V.A.C.C.P., provides:

"A continuance or postponement may be granted on the motion of the State or defendant after the trial has begun, when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have

anticipated, the applicant is so taken by surprise that a fair trial cannot be had."

■ Under the standard of Art. 29.-13, supra, it must appear to the satisfaction of the court that "a fair trial cannot be had" before a continuance or postponement is warranted. A motion for continuance sought on the grounds of surprise is addressed to the sound discretion of the trial court. *Hightower v. State,* 629 S.W.2d 920 (Tex.Cr.App.1981); *Ewing v. State,* 549 S.W.2d 392 (Tex.Cr.App.1977); *Cooper v. State,* 509 S.W.2d 565 (Tex.Cr.App.1974). A failure to grant a motion for continuance on the grounds of surprise is not error unless there is a showing of an abuse of discretion. *Garcia v. State,* 581 S.W.2d 168 (Tex.Cr.App.1979), *vacated on other grounds,* 453 U.S. 902, 101 S.Ct. 3133, 69 L.Ed.2d 988 (1981); *Ford v. State,* 502 S.W.2d 160 (Tex.Cr.App.1973); *Guerrero v. State,* 487 S.W.2d 729 (Tex.Cr.App.1972).

■ We do not find the trial court abused its discretion by denying appellant's motion for a continuance. Appellant was advised of the identity of the uncalled witnesses to the extraneous offense and had sufficient opportunity to discover any exculpatory information within their knowledge. There has been no showing, by bill of exception or motion for new trial, that these witnesses were in any way unavailable for investigation purposes or that appellant was precluded from presenting any exculpatory information from these uncalled witnesses to the incident. Those witnesses who were called to testify to the extraneous offense, which was not a particularly complicated matter, were thoroughly cross-examined by appellant concerning their perceptions of the incident, any prior criminal record, and any motive they may have had for testifying on behalf of the State. Furthermore, the trial court allowed the testimony of one of appellant's attorneys, who had accompanied appellant

and the bailiff during trips between the holdover cell and the courtroom, and she testified she was never placed in fear of death or bodily injury by appellant.

Upon a review of the record, we conclude that the trial court did not abuse its discretion in denying appellant's motion for continuance. Appellant's contention that he was unable to fairly confront and cross-examine the witnesses is without merit. Appellant's eighth ground of error is overruled.

In his ninth ground of error, appellant contends the trial court erred in denying his motion demanding a statement of allegations concerning evidence on punishment. Through this pretrial motion appellant sought a list of the witnesses the State intended to call at the punishment phase of trial as well as "a statement of precisely what facts and circumstances the State intends to prove at the punishment phase of the trial."

■ By this ground of error, appellant does not appear to complain that unlisted witnesses were allowed to testify at the punishment phase of trial[5], but complains only of the denial of the statement of allegations concerning evidence on punishment. Appellant cites no authority for the proposition that he was entitled to a summary of the punishment witnesses' anticipated testimony. Appellant merely contends that it was a denial of his constitutional right to confront and cross-examine witnesses against him when he was unaware of the evidence that would be presented.

■ Appellant's argument is without merit. The record reflects appellant engaged in full cross-examination of the State's punishment witnesses and was not denied his constitutional right to confront

---

5. Any argument in this regard would be without merit. Four of the State's punishment witnesses were unknown to the State prior to trial, and their names were withheld at the punishment phase for security purposes. Two of the State's punishment witnesses were listed on the subpoena list. The remaining State's witness, a fingerprint expert, should have been anticipated by appellant.

his accusers. Appellant's ninth ground of error is overruled.[6]

The judgment of the trial court is affirmed.

CLINTON, J., concurs.

TOM G. DAVIS, J., not participating.

TEAGUE, Judge, dissenting.

Based upon what the majority opinion states, I am compelled to expressly dissent to the majority opinion's overruling appellant's first, sixth, and eighth grounds of error.

First-off, I dissent to the majority opinion overruling appellant's sixth ground of error, which asserts that the evidence is insufficient to sustain the jury's "Yes" answer to the probability question. See Art. 37.071, V.A.C.C.P.

The majority opinion expressly states the following: "This deliberate and brutal murder coupled with appellant's subsequent callous conduct evidences a total lack of regard for the sanctity of life, ownership of property, and respect for the personal dignity of individuals who had gone out of their way to help appellant." In making this statement, the majority opinion implicitly minimizes the fact that the husband-victim of the deceased testified at the punishment stage of the trial *on behalf of* Jeffery Allen Barney, appellant.

The majority opinion holds that the evidence is sufficient to support the jury's affirmative finding that there is a probability that appellant would commit future criminal acts of violence that would constitute a continuing threat to society. In light of the husband-victim's testimony, I am compelled to disagree with the majority opinion.

The majority opinion, understandably from a Federal constitutional standpoint, declines to apply in full to this cause the erroneous rule of law that this Court gave

birth to several years ago, namely, "that the circumstances of the capital offense, if severe enough, can be sufficient to sustain an affirmative finding to the second special issue," which rule of law flies in the face of what the Supreme Court of the United States stated and held in, among other cases, *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which decision may be read as eliminating systems of capital punishment which vest in juries the power to return death sentences in discriminatory, freakish, and infrequent patterns. The sentencing authority's discretion, however, must be "guided and channeled by requiring examination of *specific factors* that argue in favor of or against the imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." *Proffitt v. Florida*, 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976). In Texas, the issues that are submitted to a jury in a death penalty case are part of the "channeling" process that in part causes the Texas death penalty statute to continue to be held constitutional by this Court, as well as by Federal Courts. A general verdict by a jury, finding the accused guilty of the offense of capital murder, is no longer sufficient to support the assessment of the death penalty. Thus, a jury no longer has unbridled discretion in a capital murder case to cause the punishment of death to be inflicted solely because it has found the defendant guilty of the offense of capital murder. Today, among other things, before the death penalty may be lawfully imposed, the jury is required to find that the evidence shows beyond a reasonable doubt that there is a (reasonable) probability that the defendant who has been found guilty of capital murder would commit (future) criminal acts of violence that would constitute a continuing threat to society. Art. 37.071, supra.

6. By this ground of error appellant also multifariously contends that the financial limitation on investigation fees deprived him of due process and equal protection of the laws. Since appellant failed to show harm by the denial of

additional investigative fees, see *ante,* at 126, we find it unnecessary to respond to any claimed deprivation of constitutional rights. *Reed,* supra at 481–482.

In this cause, there is no question but that the facts that gave rise to the jury finding appellant guilty of capital murder are unpleasant, shocking, gruesome, and horrible. But, isn't that true in every case that this Court has considered since the advent of Article 37.071, supra, where the murder was committed in the course of committing or attempting to commit the offense of aggravated rape? See and Cf. *Roney v. State*, 632 S.W.2d 598, 603 (Tex. Cr.App.1982), in which this Court stated the following: "Although this was a senseless murder, that fact is true of every murder committed in the course of a robbery." Such statement is also true of every murder committed in the course of an aggravated rape.

However, and notwithstanding that the facts of this case are unpleasant, shocking, gruesome and horrible, the husband-victim of the deceased testified *on behalf of appellant* at the punishment stage of appellant's trial. Given the facts of this case, it is difficult to understand or comprehend why the husband-victim testified at the punishment stage of this death penalty case on behalf of the appellant, unless there is more that meets the eye than what is stated in the majority opinion. Cf. *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr. App.1979), where the defendant's wife testified at the guilt stage of her husband's, the defendant's, trial. This testimony, unquestionably, had to have had a major impact on the jury and had to have been a major factor in the jury's answering in the affirmative at the punishment stage the special issues that were submitted. Conversely, in this day and age, should we not at least give the husband-victim's testimony that was given at the punishment stage of appellant's trial that same kind of respect and deference?

The majority opinion, however, in rejecting appellant's ground of error, tells us that "the record reflects more" than the commission of the offense itself in order to sustain the jury's affirmative answer to the probability question. It states the following: "Appellant expressed a total lack of remorse for the instant offense and assert-

ed a willingness to repeat the crime, even during the pendency of his trial."

But, does appellant also not tell us through his confession that he strangled the deceased because she had angered him "by a remark?"

The majority opinion does not advise us what the "remark" might have been. The opinion, however, although not informing us just what caused appellant to hate the deceased, does inform us that there was a great deal of hatred by appellant for the deceased. Psychologically, and legally, the probative value of a given remark that might indicate or reflect one's propensity "to fly off the handle" depends, of course, upon what the remark consisted of and the remark's relationship to the act that might have been committed. A given remark might be sufficient to warrant a finding that one person killed another person solely because the remark would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. See V.T.C.A., Penal Code, Section 19.04. Such also might explain why that person did not later show any remorse for causing the death of the deceased, or why he might have expressed a desire to others that he would repeat the killing if given the opportunity to do so.

The majority opinion, notwithstanding its express declaration that "We need not rely upon the [facts of the] instant offense alone ...," states that "the most compelling evidence of future dangerousness derives from appellant's conduct *during the guilt stage of his capital murder trial* in possessing a homemade weapon, plotting an escape from custody, and contemplating the harm of the courthouse bailiff." (My emphasis.)

The majority opinion places great emphasis on the fact that appellant declared that if he got the chance to escape he would do so. Because I dare say that such a thought has not gone through the mind of every single person who has ever been incarcerated, and also been expressed ei-

ther seriously or not so seriously by such persons, I am unable to agree that such remark has any value in deciding whether such a person will in the future commit acts of criminal violence that would constitute a continuing threat to society.

The majority opinion also places great emphasis upon the finding of "a shank" in the court's holdover cell, and testimony that appellant was seen in possession of the "shank." The latter testimony, however, was adduced from two fellow prisoners, and for this reason should be presumptively suspect. I find that it has little or no value in deciding whether the second special issue should be answered in the affirmative.

The majority opinion also emphasizes that appellant had declared to others that he intended to use the "shank" to escape from confinement during his trial and in doing so would harm the court's bailiff if he had to. In light of the uncontradicted testimony of appellant's female attorney that she had accompanied appellant and the bailiff during trips between the holdover cell and the courtroom and had never been placed in fear of death or bodily injury, I find that such is virtually worthless in deciding whether the evidence sustains the jury's answer to the probability question.

Lastly, but in light of what the media informs us of what is happening in our penal institutions today, of which I for one am willing to take judicial notice of, an inmate's possessing "a shank" certainly does not reflect a necessary probability that such person would commit in the future criminal acts of violence that would constitute a continuing threat to society. Today, we are informed that possession of "a shank" by an inmate probably only reflects or indicates that the individual possessed same in order to keep himself from getting abused, maimed, or killed by his fellow inmates or that the adopted security measures for seeing that inmates do not possess such weapons is lacking.

In light of what the majority opinion states, to support its conclusion that the evidence is sufficient to sustain the jury's

affirmative finding to the probability question, I am unable to agree that appellant's sixth ground of error should be overruled.

Not only because of the cursory treatment that the majority gives to appellant's first ground of error, but because of what this Court has stated and held in the past, I am also compelled to dissent to the majority's disposition of appellant's first ground of error, "That the trial court committed reversible error when it denied appellant's motion for a mistrial and permitted juror Sherry Lynne Payne to serve in spite of her disqualifications due to her inability to be fair and impartial and do her duties as a juror."

Because juror Payne was never replaced as a juror, the provisions of Art. 36.29(b), V.A.C.C.P., which governs the replacement of a juror who dies or becomes disabled during the trial of a case, are inapplicable to this cause. Furthermore, the record is clear that appellant objected to Payne being replaced by an alternate juror.

It is clear from the record that when juror Payne asked to speak to the trial judge on the second day of trial, after the State had presented at least six witnesses, the trial judge did not know what he was in for that day. Payne told the trial judge in no uncertain terms that she would conduct her deliberations with regard to her personal life rather than the case and that she could not be a fair and impartial juror. Appellant moved for a mistrial, but same was denied by the trial judge. Payne remained as one of the jurors. The majority opinion holds: "Appellant was not entitled to the more relief of a mistrial, which was demanded to the exclusion of any other relief." I disagree. The trial judge had no choice about the matter. He should have declared a mistrial and commenced anew.

As a matter of law, had Payne expressed during her voir dire examination her inability to serve as a fair and impartial juror, she would have been subject to challenge for cause by either the State or the appellant pursuant to Art. 35.16(a)(8), V.A.C.C.P. Also see *Noah v. State*, 495 S.W.2d 260, 264 (Tex.Cr.App.1973); *McCary v. State*,

477 S.W.2d 624, 628 (Tex.Cr.App.1972); *Ransom v. State*, 630 S.W.2d 904 (Tex.App. —Amarillo 1982). However, when Payne made known her inability to be a fair and impartial juror, the time for either side challenging her for cause had long since passed. Thus, this is a case where the juror laid behind the log and was not honest with the court, counsel for the State, or counsel for the appellant when she was being voir dired. Such concealment, if not contemptuous conduct, borders on contempt of court. Payne, however, was not held in contempt of court, but was permitted to sit as a juror in appellant's cause.

I pause to point out that this is not a case where, *prior to the selection of all twelve jurors*, it was belatedly discovered that a juror should not have been permitted to serve on the jury and was stricken by the trial judge, but no mistrial was declared. See *Bodde v. State*, 568 S.W.2d 344 (Tex. Cr.App.1978); *Black v. State*, 46 Tex.Cr.R. 590, 81 S.W. 302 (Tex.Cr.App.1904). However, in this instance, Payne did not make it known to all that she could not be a fair and impartial juror *until after all twelve jurors had been selected and after the State had presented at least six witnesses* during its case in chief. This appears to be a case of first impression for this Court. However, the majority opinion, implicitly at least, gives the appearance that what occurred in this cause happens all of the time in our trial courts. I disagree.

I also pause to point out that appellant is not challenging by way of post-conviction habeas corpus the action of the trial judge in not declaring a mistrial, see *Ex parte Bronson*, 158 Tex.Cr.R. 133, 254 S.W.2d 117 (1953), which he cannot do, but is challenging the trial court's action in not declaring a mistrial through direct appeal. Cf. *Ex parte Lovelady*, 152 Tex.Cr.R. 93, 207 S.W.2d 396 (1948), in which although a person who had been adjudicated insane was the jury foreman in that cause, this Court held that such could not be attacked collaterally.

It appears to me that when it is learned or discovered after a capital murder jury has been selected and has heard testimony from the State's witnesses, and it was unknown to either the prosecuting attorney or the defense attorney that a juror serving thereon was contaminated because he or she could not serve as a fair and impartial juror, the only cure or remedy for such contamination is for the trial judge to declare a mistrial, and probably hold the contaminated juror in contempt of court and punish that person accordingly. Not to at least declare a mistrial greatly diminishes the great faith that we mortals have in the verdicts of juries.

Therefore, I would apply to this case what this Court has stated and held in those cases in which a juror who was absolutely disqualified from serving obtains a seat on the jury, and the defendant attacks the jury's verdict on direct appeal. In that instance, this Court has held that a verdict rendered by such a jury is void ab initio. *Gonzales v. State*, 146 Tex.Cr.R. 452, 176 S.W.2d 195 (1943); *Russell v. State*, 84 Tex.Cr.R. 245, 209 S.W. 671 (1919).

Based upon the cursory treatment that the majority opinion gives to appellant's first ground of error, as well as what is probably an erroneous conclusion, I respectfully dissent to the majority opinion overruling appellant's first ground of error.

I further dissent to the majority opinion's disposition of appellant's eighth ground of error, in which he asserts that the trial court erred in denying his written motion for continuance that was made during the punishment stage of the trial.

The record reflects that when it became known to the appellant's counsel that the State intended to introduce into evidence the "shank" that had been found in the court's holdover cell, in which appellant was housed during the trial, counsel orally moved for a continuance, in order to investigate the facts and circumstances of the incident. The trial judge neither granted nor denied this motion. Later, counsel filed a written motion for continuance. Pursuant to the motion, the prosecuting attorney supplied appellant's counsel with

the names of all possible witnesses to the incident, "who were not going to be called to testify," but declined to furnish counsel with the names of all possible witnesses to the incident "who were going to be called." He declined to do so for "security purposes." The written motion for continuance was denied.

In *Garcia v. State,* 581 S.W.2d 168 (Tex. Cr.App.1979), in the concurring opinion that Judge Truman Roberts of this Court filed in that cause, His Honor stated the following, inter alia: "Article 37.071 should not be construed as authorizing proof of unadjudicated, extraneous offenses if this comes as an unfair surprise to the defendant. Notice, a fundamental element of due process, must be provided. Allowing proof of unadjudicated, extraneous offenses comes close to allowing one or more 'prosecutions' of the defendant in the sentencing proceeding. Simple fairness requires that the defendant be given notice that the State intends to offer proof of unadjudicated, [footnote deleted] extraneous offenses, so that the defendant and his counsel *can investigate and prepare a response.*" (180–181). (My emphasis.) The trial court erred in not granting the appellant's motion for continuance. I dissent to the majority opinion's contrary holding.

This concludes my dissenting opinion.

Although I do not write more, this does not mean that I am completely and totally satisfied with what the majority opinion states in disposing of appellant's other grounds of error.