

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DANIEL VALLES, | § | No. 08-23-00241-CR |
| Appellant, | § | Appeal from the |
| v. | § | 210th Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20190d04292) |

## MEMORANDUM OPINION

Appellant Daniel Valles appeals his conviction for murdering his girlfriend, Lea Celeste Grijalva. He challenges the admissibility of evidence of his guilt, the trial court's denial of his requests for mistrials, and the sufficiency of the evidence. Finding no error, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Appellant and Lea lived together as a couple for four years. Their relationship became strained when Appellant suspected that Lea was being unfaithful. On June 8, 2019, Appellant and Lea argued for much of the day. They spent the evening apart and visited with their respective friends and family. When Lea returned with Appellant to the home they shared with a friend, Christian Baeza, they began arguing again, continuing into the early morning hours. The home's security system recorded the sounds of Appellant screaming in a rage, Lea's crying, and her pleas for him to

1

stop. It also recorded Appellant waking his roommate, Baeza, and telling him that he killed Lea. Appellant's parents, EMS, and law enforcement soon arrived to the home. Lea was unresponsive and Appellant was detained.

A few hours later, Appellant was questioned at the police station and confessed to strangling Lea. A medical examiner found that Lea had multiple contusions on her neck, petechial hemorrhages, injuries to the strap muscle of her neck, and injuries to her chest. She determined that Lea's cause of death was asphyxia due to strangulation. Appellant was charged and tried for murder. The evidence before the jury included the home security video and Appellant's video-taped confession. After five days of trial, the jury found Appellant guilty, and the trial court sentenced him to 70 years.

Appellant raises five issues on appeal. Issues One and Two challenge rulings relating to the home security video. Issue Three challenges the admissibility of his video-taped confession. Issue four challenges the denial of a mistrial after a witness testified to what Appellant says is impermissible character evidence. And Issue Five challenges the sufficiency of the evidence to support the conviction.

## II. ANALYSIS

### A. Home security video

The home that Appellant and Lea shared was equipped with Vivint home security cameras, both inside and outside. Their roommate, Baeza, had the Vivint app on his phone that allowed him to view a live feed and recorded footage. Baeza showed this app to Detective Lara at the scene. Baeza met with Detective Lara again at the station and Lara and another officer captured the Vivint video from the previous night by recording Baeza's phone while the videos played. Detective Camacho had also obtained the home security video from Vivint, but the State failed to file a business records affidavit to authenticate that video. So instead, the State offered, and the trial court admitted, the recording made from Baeza's phone.

A condensed version of the video footage from inside the home was admitted as evidence and played for the jury.[1] The security camera was in the dining area, showing most of that room, the living room, and front door. The video shows Appellant and Lea coming home shortly after 1:00 a.m. and arguing. For more than an hour, there is intermittent screaming and arguing, most of which is unintelligible. And most of the time, Appellant and Lea are out of view of the camera. Around 2:24 a.m., the arguing escalates. Lea could be heard crying after a loud slapping sound. She pleads with Appellant to stop and screams "ow" repeatedly. Appellant can also be heard angrily yelling. Around 2:44 a.m., Baeza came home and can be heard asking Appellant and Lea if they are OK. At about 3:06 a.m., Lea can be heard screaming again. At 3:20 a.m., Appellant is heard crying and telling Christian three times, "I killed Lea." The video shows Appellant's parents, and then EMS arriving. From this point on, the video was edited to remove the audio to prevent hearsay statements being played for the jury. The video concludes with EMS carrying Lea out on a stretcher and performing chest compressions while Appellant's father struggles with Appellant to prevent him from leaving.

Appellant raises two issues about the home security video. First, he argues that the trial court erred in denying a mistrial after Detective Camacho testified that the video from Baeza's phone was the same as the video he received from Vivint. Second, he argues that the video was not authenticated, contained hearsay, and denied his right to confront Baeza.

**(1) Denial of mistrial**

Before the security camera footage was admitted, the State sought to establish that the videos recorded from Baeza's phone were the same as the videos Detective Camacho received directly from

---

[1] The full recording is approximately four hours long. That was also entered into evidence, but since much of it showed an empty room with no sound, the State also offered an edited version that cut out large swaths of video that show no activity.

Vivint. After the trial court sustained one objection to the State's questions to Detective Camacho, the following exchange occurred:

> Q:      And in regards to the actual [Vivint] video itself, what did you see on those videos?
>
> A:      I saw the same footage that we had captured on the witness's cellphone when we were recording from the Vivint videos that they had on their phone.
>
> Q.      Could you see events that you knew to have happened or were there for on the video?
>
> [Defense Counsel]:      Objection, Your Honor. Assuming facts in [*sic*] evidence and no personal knowledge.

After a discussion at the bench about the admissibility of testimony comparing two videos, neither of which was in evidence at that time, the trial court sustained the objection and instructed the jury to disregard the testimony about video recordings.

The State argues that Appellant did not preserve his complaint. We agree. "As a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a *timely* request, objection, or motion . . . . " Tex. R. App. P. 33.1(a)(1) (emphasis added). "If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and any claim of error is forfeited." *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008). The State asked Detective Camacho what he saw when he watched the videos from Vivint. He answered and the State asked another question before Appellant objected. Appellant's objection was not timely and he forfeited his complaint.[2]

---

[2] Even had he properly preserved his complaint, there is a presumption that the jury followed the trial court's instructions to disregard the testimony. Appellant has failed to rebut this presumption by directing us to evidence that the jury disregarded the instructions. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

### (2) Admissibility of the security video

"We review a trial judge's decision to admit or exclude evidence under an abuse of discretion standard." *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). A trial court abuses its discretion when the decision falls outside the zone of reasonable disagreement. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Stated otherwise, the trial court abuses its discretion when it acts "without reference to any guiding rules and principles" or its rulings are arbitrary or capricious. *Torres v. State*, No. 08-09-00266-CR, 2011 WL 3199065, at *1 (Tex. App.—El Paso July 27, 2011, no pet.) (not designated for publication).

To authenticate the video, Detective Lara testified that the live feed was an accurate representation of events at that time and that he recorded the video from Baeza's phone. Appellant argues that because Baeza did not testify to authenticate the videos, he was denied the right to confrontation. This argument conflates two distinct concepts: authentication and confrontation.

The crux of Appellant's argument is that the video could be authenticated only by Baeza. But Rule 901 is flexible and allows for more than method of authentication. *Fowler v. State*, 544 S.W.3d 844, 849 (Tex. Crim. App. 2018) ("[E]ven though the most common way to authenticate a video is through the testimony of a witness with personal knowledge who observed the scene, *that is not the only way*") (emphasis added); *Hines v. State*, 383 S.W.3d 615, 624–25 (Tex. App.—San Antonio 2012, pet. ref'd). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what its proponent claims it is." Tex. R. Evid. 901(a). One of the various avenues to satisfy this requirement is evidence of "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Tex. R. Evid. 901(b)(4).

5

At trial, the jury determines "whether an item of evidence is indeed, what the proponent claims"; the trial court only makes "the preliminary determination that the proponent . . . has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015). Said another way, the trial court need not be convinced that the item is authentic; it need only determine that a reasonable juror could find that the item is authentic. *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007).

In this case, Appellant told law enforcement that he had a Vivint home security system. Detective Lara testified that, while still at the scene, he looked at the Vivint app on Baeza's phone and could see a live feed that accurately reflected the activity that he was seeing at that moment in person. The EMS worker testified that a still photo taken from the security video "fairly and accurately depict[ed]" EMS inside of Appellant's home. As for audio portion of the video that was not redacted, Lea's mother testified that the voices on the video were Appellant and Lea's. Tex. R. Evid. 901 (b)(5) (authentication by identification of a person's voice). This evidence of the contents and circumstances of the video could support a finding that the video was what the State claimed it to be–a security video that recorded the events of the night of Lea's murder.

Authentication of the video by evidence other than Baeza's testimony did not violate Appellant's right to confrontation. The Sixth Amendment guarantees a defendant's right to confront those who testify against him. *Crawford v. Washington*, 541 U.S. 36, 51, (2004). "'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Id.* (quoting 2 *N. Webster, An American Dictionary of the English Language* (1828)). Appellant does not point to any statements by Baeza, much less testimonial statements, that were used against him in court. Even if out-of-court statements of Baeza had been used to authenticate the security video, the right of confrontation is more limited with authentication

6

testimony. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311, n. 1 (2009) ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case.").

Finally, Appellant makes the general allegation that the video contains hearsay, but he does not specify what statement he claims is hearsay. The only statement on the video that could be offered for the truth of the matter asserted is Appellant's statements to Baeza that he killed Lea. Tex. R. Evid. 801(d) (defining hearsay as a statement offered "to prove the truth of the matter asserted"). But Appellant's own statements are not hearsay. Tex. R. Evid. 801(e)(2); *Trevino v. State*, 991 S.W.2d 849, 852–53 (Tex. Crim. App. 1999) (en banc) ("A party's own statements are not hearsay and they are admissible on the logic that a party is estopped from challenging the fundamental reliability or trustworthiness of his own statements.").

We hold that the home security video was admissible and overrule Appellant's issues one and two.

**B. Confession**

Appellant was detained at the scene and placed in a police car around 4:00 a.m. He was later transferred to the station and placed in a holding cell. At about 8:30 a.m., Appellant was removed from the holding cell and interrogated by Detectives Camacho and Gomez.

The entire interrogation was recorded. After providing his personal information and answering questions about his level of education and employment, Appellant was advised about his right to remain silent, to have an attorney present, and to terminate the interview. He affirmed that he understood those rights and voluntarily waived them. Over the next 15 minutes, Appellant answered questions about his relationship with Lea and he recounted the events and arguments of

7

the day before. About 17 minutes into the interrogation, Appellant told the detectives that Lea admitted to him that she was talking to another man. He stated that he was angry because she refused to unlock her phone for him to read their communications and he grabbed her by the neck with one hand. She finally gave him the passcode and he read the messages. Appellant told the detectives that once his suspicions were confirmed, he "did blow [his] top" and he was "enraged." He stated that he was on top of Lea on the bathroom floor and he strangled her with both hands for about two minutes until she stopped breathing. At the end of the interview, Detective Camacho asked Appellant, "There's nobody that could have done this to Lea but you. Is that true or not?" Appellant confirmed it was true.

Appellant moved to suppress the video of his statement. The trial court held a pre-trial suppression hearing at which Detectives Camacho and Gomez testified and the court viewed the interrogation video. After the hearing, the trial court denied the motion to suppress and made findings that Appellant was in custody when he was interrogated, that he was advised of and understood his rights, that he agreed to continue the questioning, and that his statement was voluntary.

Appellant re-urged his motion to suppress several times during trial. The trial court again denied the motion and orally made the following findings: "[T]here was no credible evidence that the defendant was unduly frightened, intimidated, coerced; he did not have any mental–anything affecting his mental state, either due to alcohol, sleep deprivation or any other issues with his mental capacity that was either attributed to law enforcement action or that was evidenced on the video that was viewed by the Court." The video was played for the jury in its entirety.

Appellant argues that his confession was not voluntary, and the trial court erred by denying his motion to suppress.

8

**(1) Standard of review**

Appellate courts review a trial court's ruling on a motion to suppress under a bifurcated standard. *See State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020). A trial court's findings of historical fact, and determinations of mixed questions of law and fact that turn on credibility and demeanor, are afforded almost total deference if they are reasonably supported by the record. *See id.* (citing *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019)).

The same deferential standard of review is applied to a trial court's determination of facts that are based on a video recording admitted at the suppression hearing. *See State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013). That said, appellate courts may review de novo "indisputable visual evidence" contained in a videotape. *Id.*

When the trial court makes findings of fact, a reviewing court determines whether the evidence, viewed in the light most favorable to the court's ruling, supports those findings. *See Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013). The prevailing party is afforded the "strongest legitimate view of the evidence," along with all reasonable inferences that can come from it. *Duran*, 396 S.W.3d at 571 (quoting *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011)).

**(2) Miranda rights**

Appellant argues that law enforcement should have informed him of his rights immediately upon his arrest, rather than hours later before he was interrogated. To safeguard a person's Fifth Amendment right not to incriminate himself, law enforcement must advise individuals of their rights to remain silent and to an attorney before custodial questioning. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). This requirement, as well as a requirement to advise an accused of their right to terminate the interrogation is codified in the Texas Code of Criminal Procedure. Tex. Code Crim. Proc. Ann. art. 38.22 §2(a); §3(b). *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

The obligation to give *Miranda* warnings is triggered by an interrogation, not an arrest. *Rhode Island v. Innis*, 446 U.S. 291, 300, (1980) ("It is clear therefore that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."); *Carter v. State*, No. 01-17-00159-CR, 2018 WL 5259895, at *3 (Tex. App.—Houston [1st Dist.] Oct. 23, 2018, no pet.) (mem., not designated for publication) ("There is no requirement that *Miranda* warnings be given immediately but only that they be given prior to custodial interrogation."). Nothing in the record suggests that Appellant was questioned, or even spontaneously offered information, before being advised of his rights.

### (3) Knowing and intelligent waiver of rights

Appellant complains that his waiver of rights was not voluntary because the detectives "did not ascertain [Appellant's]level of sleepiness, intoxication, memory or faulty memory, medical history, medication, [and] emotional and mental state." A statement made by an accused is not admissible evidence unless the accused waives his rights "knowingly, intelligently, and voluntarily." Tex. Code Crim. Proc. Ann. art. 38.22, §3(a)(2). Two inquiries are relevant in determining whether an accused waives his rights voluntarily, knowingly, and intelligently. "We first consider whether the waiver was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and then determine whether the waiver was made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Torres*, 543 S.W.3d at 411(citing *Moran v. Burbine*, 475 U.S. 412, 421(1986)). Appellant does not claim that his confession was coerced. His argument, then, goes to the second inquiry–whether he comprehended his rights and the consequences of his waiver.

Voluntariness is evaluated by a "totality of the circumstances" which "requires the consideration of 'all the circumstances surrounding the interrogation,' including the defendant's

experience, background, and conduct." *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The detectives testified in so many words that they evaluated the totality of the circumstances and concluded that Appellant comprehended his rights and waiver of those rights. Detective Gomez admitted that he is not qualified to determine whether someone has a mental illness but does determine whether someone comprehends his situation by whether he is answering questions "in a normal fashion." Similarly, Detective Camacho explained that he asks "qualifying questions," to gauge the comprehension of an accused. At the beginning of the interview, before asking any questions about the incident, Detective Camacho asked Appellant for his personal information (date of birth, social security number, phone number), where he worked and for how long, and his level of education. Appellant answered each question clearly and without hesitation. Throughout the interview, Appellant appeared alert and he was cogent and able to respond to the questions.[3]

Nor was there any reason to think that Appellant's particular circumstances affected his ability to understand his rights and the consequences of waiving them. Although Appellant may not have slept much in the 24 hours leading up to the interrogation, there were no signs that he was sleep deprived. Appellant was not sleeping while he was in the holding cell. During the interview, he did not nod off or ask to stop the interview to sleep. *Barney v. State*, 698 S.W.2d 114, 121 (Tex. Crim. App. 1985). Nor would a lack of sleep alone make a statement involuntary. *Sandoval v. State*, 665 S.W.3d 496, 523 (Tex. Crim. App. 2022).

Appellant also told the detectives that he was intoxicated the night before. But, there was no evidence that Appellant was still intoxicated at the time of the interrogation. After Appellant told the

---

[3] There was no evidence that Appellant had a mental illness or was taking medication that prevented him from comprehending his rights. At trial and on appeal, Appellant argues only that his confession should be suppressed because the detectives did not "ascertain" if he had such issues.

11

detectives that he had been intoxicated, Detective Camacho asked him, "But right now it's 8:00. Almost 9:00. We're good now, right? Yes?" Appellant answered "Yes." Both Detectives Camacho and Gomez testified that Appellant did not look or act like he had been drinking and they did not smell alcohol on him. Our own review of the video confirms that he was not behaving as if he were intoxicated or impaired in any way. But, even if Appellant were still intoxicated at the time of the confession, "[i]ntoxication, while relevant, does not render a confession involuntary *per se.*" *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996).

We overrule Appellant's third issue.

## C. Character evidence

Emily Sierra was Lea's friend and worked at Wal-Mart with both Appellant and Lea. During her testimony, she was asked about their relationship:

> Q:     [C]an you tell us what the demeanor of both couple [sic] in a working capacity at Walmart? What you observed while working?
>
> A:     Well, I believe Daniel to be dismissive towards Lea ---
>
> [Defense Counsel]:   Objection, Your Honor. This goes against the motion in limine that we have. And its objection under 404(b) and I ask that we have that stricken from the record and an instruction made to the jury.

The trial court sustained the objection and instructed the jury to disregard the answer. Appellant then moved for a mistrial, which was denied. Appellant argues that Emily's testimony was impermissible character evidence and that the harm it caused was too prejudicial to be cured by a jury instruction.

Appellant's objection at trial was grounded in Texas Rule of Evidence 404(b). That rule prohibits "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). Emily did not testify about a prior crime, wrong, or other act–she simply characterized Appellant as "dismissive." On appeal, Appellant challenges the testimony as impermissible character

12

evidence under a different provision, Rule 404(a). Rule 404(a) states that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait. Tex. R. Evid. (a)(1). Because Appellant did not object on this ground at trial, he forfeited any complaint. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) ("the point of error on appeal must comport with the objection made at trial").

Yet even if he had objected under Rule 404(a), the testimony was admissible. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009) ("if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed"). As the State points out, evidence about the relationship between the victim and defendant is admissible in cases of murder and family violence crimes. Tex. Code Crim Proc. Ann. art. 38.36(a); 38.371(b).[4]

We overrule Appellant's fourth issue.

### D. Legal and factual sufficiency

Appellant argues that the judgment is not supported by factual or legally sufficient evidence. In 2010, the Court of Criminal Appeals limited our review to legal sufficiency challenges. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) ("the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."). We therefore address only the argument that the evidence is legally insufficient.

In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must

---

[4] In addition, Appellant argues that the testimony that he was "dismissive" was an "attempt on the part of the State to claim the relationship was volatile." However, showing that someone behaves "dismissively" towards another does not show that the relationship was "volatile," much less that committing murder is in conformity that person's character.

review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard applies whether the evidence was direct or circumstantial. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We defer to the fact-finder to make inferences and resolve conflicts in the evidence. *Id.* "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* We do not re-weigh evidence or substitute our judgment for that of the fact-finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We may not resolve any conflict of fact or assign credibility to the witnesses. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992) (en banc).

Appellant's argument is based on his position that Baeza was a "critical eyewitness" that was necessary to authenticate the surveillance footage. The fact that the surveillance footage was available through an app on Baeza's phone does not make him an eyewitness. Nor, as we explained above, was his testimony necessary to authenticate the videos.

Appellant also claims that "the State supported its case with ambiguous evidence that was insufficient for a jury to make a determination." To find Appellant guilty of murder, the jury had to find that he either "intentionally or knowingly caused [Lea's] death" or that he "intend[ed] to cause serious bodily injury and commit[ed] an act clearly dangerous to human life that cause[d] the death." Tex. Pen. Code Ann. §19.02(b)(1), (2). Appellant confessed that he placed both hands around Lea's neck and strangled her for about two minutes until she stopped breathing. His confession was corroborated by evidence that: (1) he and Lea argued in the street earlier in the night; (2) they continued to argue for hours when they got home; (3) Lea screamed in fear and

14

pain; (4) Appellant told Baeza that he killed her; and (5) the medical examiner determined that Lea died of asphyxia by strangulation. This evidence was sufficient for a rational jury to find that Appellant strangled Lea, an act that is "clearly dangerous to human life." The jury also heard Appellant's statement to the detectives that he did this because he was in a rage after seeing Lea's communications with another man. The jury could rationally find from this that he either intended to kill her or to cause her serious bodily injury.

We overrule Appellant's fifth issue.

## III.   CONCLUSION

We hold that the jury had before it legally sufficient and properly admitted evidence to support its guilty verdict. The trial court's judgment is affirmed.

JEFF ALLEY, Chief Justice

November 8, 2024

Before Alley, C.J., Palafox, and Soto, JJ.

(Do Not Publish)

15